IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

STANLEY T. ADAMS

                      Petitioner,                              CASE NO. 1:05 CV 1886

         v.

                                                       <u>MEMORANDUM OPINION</u>

MARGARET BRADSHAW, WARDEN,

                      Respondent.

KATZ. J.

      This matter is before the Court upon Petitioner, Stanley T. Adams's  ("Adams" or "Petitioner") Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 filed with this Court on May 19, 2006. (ECF 16). Adams challenges his conviction and death sentences imposed by the Court of Common Pleas of Trumbell County, Ohio.  The Court has before it the Petition, Respondent, Margaret Bradshaw's ("Respondent"), Return of Writ (ECF 19), Adams's Traverse, (ECF 57), and the Respondent's Reply to Traverse. (ECF 58).  For the following reasons, the Petition for Writ of Habeas Corpus will be denied.

## I. INTRODUCTION

      Adams appeals from his convictions and sentence of death for the aggravated murders of Esther Cook and Ashley Dawn Cook.

### Factual Background

      The following facts were set forth by the Ohio Supreme Court in *State v. Adams,* 103 Ohio

St.3d 508 (2004).

From Christmas 1998 until March 1999, Adams and his girlfriend, Janelle ("Nelly") Hartle, lived with Esther and Ashley on Dickey Avenue in Warren. After March 1999, and at the time of the murders, Adams and Janelle and their infant daughter lived on Mahoning Avenue in Champion, Ohio. James Hartle, who sometimes lived with Esther, was the father of Ashley and Janelle, who were half-sisters.

On the afternoon of October 11, 1999, Adams borrowed a blue 1991 Chevrolet Cavalier, Ohio license number BAB 2830, from his neighbors, Mike and Kelly Henry. Adams then drove to James Hartle's house, where he asked to borrow $300 from Hartle to buy a car. Hartle declined to give Adams any money.

Later that evening, Adams attended a drug party at the apartment of his friend, Mallory "Stacie" Jackson. In addition to Adams, guests included Renee Smith, Patricia Litsinger, and Derwin ("Stormin' ") Norman. That night Adams was wearing a white T-shirt, blue pants, and white tennis shoes. When Smith saw Adams, whom she had known for five years, he had $40 "and bought crack cocaine with it." Later, Adams told Litsinger that he was "broke," but he offered cocaine to her in exchange for oral sex. Litsinger refused.

After that, Adams left and told Smith that he was leaving "to get some more money." Smith reported that Adams was gone a long time. By the time Litsinger left, around 11:15 p.m., Adams had already left by himself in his search for more money.

That same night, October 11, Luetta Simmons, who lived across the street from Esther and Ashley, noticed that a dark-colored car pulled into Esther's driveway at 11:45 p.m., and that the car left around 12:15 a.m. The taillights on this car resembled the taillights on a Chevrolet Cavalier that Simmons had once owned. Simmons later noticed that neighborhood dogs were barking an in unusually "loud and obnoxious" manner.

Adams returned to Jackson's apartment. According to Smith, Adams "had blood all over his hands; * * * on his shirt, on his pants, and on the tip of his shoes," and some of the blood appeared wet. In his pocket, Adams had "[m]oney with a whole bunch of blood on it." Litsinger also observed that after Adams returned, he had blood on his hands and on his jeans.

At some point after he returned, Adams took his bloody shirt off. Norman recalled seeing Adams at the apartment when he "didn't have a shirt on," had "blood on him," and had a roll of money, some of which had blood on it.

Later, Adams again left the apartment, but this time he left with Jackson and Norman to get more drugs. Adams, driving a blue Cavalier, dropped Norman off to buy the drugs. Around 2:00 a.m., while Adams was driving around the block, Warren Police Sergeant Robert Massucci pulled Adams over because the Cavalier had only one headlight. Sgt. Massucci noticed that although the weather was cold, Adams was not wearing a shirt, and that Adams had blood on his pants, including a spot approximately four inches by six inches.

-2-

Warren Police Officer Jeff Miller, who stopped to assist Massucci, frisked Adams and discovered that "his pants were all wet and sticky, * * * gooey." With the aid of his flashlight, Miller discovered that Adams had blood on his hands, right arm, and pants, and Miller reported that the amount of blood suggested that Adams had "field dressed a deer." Adams told Miller that he had cut his hand, but Miller looked and saw no cuts. In the back of the Cavalier, Miller noticed tools and toolboxes.

Adams told Sgt. Massucci that he lived on Dickey Avenue, although his driver's license listed a different address. The officers then let Adams go with a warning about the headlight. Later, Janelle recalled that Adams had come home "in the middle of the night."

Around noon on October 12, 1999, Esther's friend, Donna Frederick, found Esther's "cold" body inside the front door of Esther's home. Frederick called police. A neighbor reported that she had seen Esther and Ashley alive the previous afternoon around 5:30 p.m.

Police found Esther's body lying face-down in a pool of blood at the bottom of the stairs. On the stairs and stairwell walls, police found blood drops and smears. Police found Ashley's body in an upstairs bedroom. Dr. Humphrey Germaniuk, a forensic pathologist, arrived at the crime scene around 1:00 p.m. that day and estimated that Esther and Ashley had been dead "eight, ten, 12 hours at least."

Dr. Germaniuk, who later performed an autopsy on Esther, concluded that she died as a result of "[m]ultiple blunt force traumatic injuries and multiple sharp force traumatic injuries" with "at least four distinct stab wounds involving the neck and head." Although police found pieces of a broken broom near the bodies of Ashley and Esther, police found no weapon that might have caused Esther's injuries. Dr. Germaniuk concluded that in inflicting the puncture wounds on Esther, the killer used "some type of tool that has an acute angle" and two prongs, such as a certain type of crowbar.

Ashley's body lay upstairs on a bedroom floor next to the bed. Her body was nude and posed, with her legs spread apart. An electric cord had been wrapped five times around her neck, and one end of the cord was in her hand. A bracelet and two earrings had been placed on Ashley's lower abdomen. After an autopsy, Dr. Germaniuk concluded that Ashley had died as a result of "strangulation associated with blunt force trauma to the head." Ashley's body also revealed multiple injuries and bruises to the genitalia as well as brain swelling, contusions to the head, and lacerations to the mouth.

Dr. Germaniuk also completed a rape kit examination during his autopsy of Ashley and obtained swab samples from her body cavities. Forensic Scientist Steve Wiechman, from the Ohio Bureau of Criminal Identification and Investigation ("BCI"), concluded that rectal, vaginal, and oral swabs from Ashley's body tested positive for semen.

After later tests, Meghan Clement, an expert in DNA analysis at LabCorp, an independent testing laboratory, conducted polymerase chain reaction ("PCR") analysis of DNA on the oral and vaginal swabs from Ashley's body and concluded that they contained a DNA mixture. Adams and Ashley could have both contributed DNA to the mixture, and nothing

-3-

in the analysis suggested that anyone else had contributed DNA to these specimens. The rectal swab, while testing positive for semen, was insufficient to yield a DNA result other than Ashley's DNA.

Dr. P. Michael Conneally, a Distinguished Professor of Medical and Molecular Genetics at Indiana University Medical Center, who is an expert on genetic statistics, agreed that genetic markers for the secondary DNA contributor in the vaginal swab matched Adams, who is Caucasian. A similar DNA profile occurs only once in 77,000 Caucasians, once in 2.3 million African-Americans, and once in 128,000 Hispanics.

At the crime scene, police found no money in the house. The bedroom where Ashley's body was found was in disarray, as if it had been ransacked. Two dressers were overturned, and blood spatters were found on the ceiling, floor, and on dresser contents. BCI Forensic Scientist Wiechman subjected two bloody sheets from the bedroom to forensic analysis. Wiechman found 17 presumptive semen stains on different parts of one sheet, tested six of them, and confirmed that three of these were semen stains.

Jennifer Duvall, an Ohio BCI forensic scientist, found DNA from semen stains in several areas on the same sheet. Adams could not be excluded as a contributor to the DNA in these stains, and his DNA was consistent with DNA in the stains. Duvall testified that DNA found at one particular site, which was identical to Adams's DNA, would be found only once in 21.1 million Caucasians and once in 1.9 million African-Americans. When Adams and Janelle lived with Esther and Ashley seven months previously, they slept in a downstairs bedroom and never used any of the upstairs bedrooms.

On October 13, police seized the blue Cavalier that Adams had driven on October 11 and 12, which Mike Henry had loaned him. Forensic testing disclosed that the steering wheel, one of the floor pedals, and the headlight lever in the Cavalier tested positive for blood, but the quantity was insufficient for analysis. On October 19, Mike Henry asked Adams why police had found blood in Henry's car after Adams had borrowed it. During this conversation, Adams denied any responsibility for the murders.

On October 20, police interviewed Adams after fully advising him of his *Miranda* rights. Adams waived those rights and gave both an audiotaped and videotaped statement of his activities on October 11 and 12. In these interviews, Adams initially denied any knowledge of the murders. After continued questioning, Adams admitted that he had stopped at Esther's house the night she was killed and that he had briefly entered the residence. Adams claimed that he had fallen over Esther's body and had then gone upstairs and found Ashley's body. He quickly departed, and he did not tell anyone what he had found. Adams admitted that on October 12, he had burned his bloody tennis shoes and trousers. In Adams's backyard police found a pile of ashes that contained a belt buckle and shoe eyelets.

In addition to the police, Adams told others that he had discovered the bodies on the night of October 11 but had not notified authorities. On October 26, he was "on the verge of crying" when he told his friend, Kevin Clements, that he had found the

-4-

bodies and had "tripped over Esther." He also told his girlfriend, Janelle, and his
sister, Tina Maus, that he had tripped over Esther's body in the house that night.
Later, he admitted to Tina that he had also found Ashley's body.
Defense case: The defense moved for acquittal under Crim.R. 29, and the trial court
denied the motion. The defense then recalled Detective Jeffrey Hoolihan, one of the
investigating detectives. Detective Hoolihan agreed that police did not take certain
investigative steps, such as examining an open window or a jewelry box for
fingerprints, searching the neighborhood for weapons, or pursuing James Hartle as
a murder suspect.

*State v. Adams*, 103 Ohio St.3d at 509 - 512.

## II. Procedural History

On November 16, 2000, Adams was indicted by a Trumbell County, Ohio Grand Jury,

charged with three counts of aggravated murder. Counts 1 and 2, related to the aggravated murder

of Ashley Cook, and contained seven identical death penalty specifications alleging murder (1) as

part of a "course of conduct," R.C. 2929.04(A)(5), (2) while committing aggravated burglary, R.C.

2929.04(A)(7), (3) while committing a kidnapping, R.C. 2929.04(A)(7), (4) while committing

vaginal rape, (5) anal rape, and (6) fellatio rape, all in violation of R.C. 2929.04(A)(7), and (7)

rape of a child under 13 years of age, R.C. 2929.04(A)(9). Count 3, charging the aggravated

murder of Esther Cook, included three specifications, i.e., murder (1) as part of a course of

conduct, (2) during an aggravated burglary, and (3) during a kidnapping. Count 4 charged

aggravated burglary while inflicting physical harm on Ashley Cook and Esther Cook with deadly

weapons.

Count 5 charged kidnapping of Ashley Cook by restraint to commit multiple rapes. Count

6 charged rape of Ashley Cook, age 12, vaginally. Count 7 charged the rape of Ashley Cook,

age 12, anally, and count 8 contained the charge of the rape of Ashley Cook orally. (Apx. Vol. 1,

p. 37- 48).

Adams was arraigned on November 20, 2000 and pled not guilty to all charges. (Apx. Vol.1, pg. 53). A jury trial commenced on August 28, 2001. (Tr. Vol. 2, pg. 262). On September 26, 2001, the jury returned a verdict of not guilty on count 7, the anal rape charge and the anal rape specifications, but convicted him of all remaining charges and specifications.  (Tr. Vol. 2, pgs. 145-171).

The sentencing phase of the trial began on October 2, 2001. (Tr. Vol.18, pg. 4269). The jury found that the aggravated circumstances outweighed the mitigating factors and returned a sentencing verdict of death for the murder of Esther Cook and Ashley Dawn Cook. (Apx. Vol. 2, pgs. 201- 202).  On October 10, 2001, the trial court accepted the recommendation of the jury and sentenced Adams to death. (Apx. Vol. 2, pgs. 212-227).

**Direct Appeal**

Adams filed a timely Notice of Appeal to the Ohio Supreme Court on November 21, 2001 raising the following propositions of law.

**Proposition of Law No. 1**
FAILURE OF TRIAL COUNSEL TO FILE A NON-SPURIOUS
MOTION TO SUPPRESS EVIDENCE CONSTITUTES A DENIAL OF THE
EFFECTIVE ASSISTANCE OF COUNSEL UNDER U.S. CONST., AMEND.
VI AND XIV AND UNDER OHIO CONST., ART. I, §10.
**Proposition of Law No. 2**
ADMISSION OF SCIENTIFIC OR EXPERT TESTIMONY AND
EVIDENCE WITHOUT THE PRELIMINARY DETERMINATION OF THE
RELIABILITY OF THE CONCLUSIONS TO BE PRESENTED VIOLATES
THE FAIR TRIAL RIGHTS GUARANTEED BY U.S. CONST. AMEND VI,
VIII, and XIV, AND BY OHIO CONST. ART. I, §§1, 2, 9, 10, AND 16. OHIO
EVID.R. 104 AND 702 CONSTRUED.
**Proposition of Law No. 3**
OHIO CONST., ART. I, §10 AND U.S. CONST. AMEND. VI AND XIV,
WHICH MANDATE A TRIAL BY A FAIR AND IMPARTIAL JURY,
REQUIRE A COURT TO EITHER CONDUCT AN INVESTIGATION OR
PERMIT AN INVESTIGATION TO BE CONDUCTED WHEN THERE
APPEARS ANY INDICIA OF JUROR MISCONDUCT.

-6-

**Proposition of Law No. 4**

A FAIR TRIAL UNDER THE SIXTH AMENDMENT TO THE
UNITED STATES CONSTITUTION CANNOT BE HAD WHEN PRE-TRIAL
PUBLICITY HAS PERVADED A COMMUNITY TO THE EXTENT THAT A
CHANGE OF VENUE IS THE ONLY REMEDY.

**Proposition of Law No. 5**

INCOMPLETE AND INEFFECTIVE VOIR DIRE DENIES A CAPITAL
DEFENDANT DUE PROCESS AND A FAIR TRIAL BY AN IMPARTIAL
JURY UNDER THE U.S. CONST. AMEND. VI AND XIV AND OHIO
CONST. ART. I, §§1, 2, 10, AND 16, AS WELL AS THE RIGHT TO
COMPETENT COUNSEL UNDER U.S. CONST. AMEND. VI AND XIV AND
OHIO CONST. ART. I, §§ 10 AND 16.

**Proposition of Law No. 6**

OHIO'S MULTIPLE COUNTS STATUTE, OHIO REV. CODE ANN.
§2941.25, IS DESIGNED TO PROTECT AN ACCUSED FROM DOUBLE
JEOPARDY IN VIOLATION OF UNITED STATES CONSTITUTION
AMENDMENT V AND XIV, AND THE OHIO CONST., ART. I, 10;
ACCORDINGLY, CONVICTION FOR TWO SEPARATE OFFENSES ARE
CONSTITUTIONAL ONLY WHEN A SEPARATE ANIMUS FOR EACH IS
DEMONSTRATED BY PROOF BEYOND A REASONABLE DOUBT.

**Proposition of Law No. 7**

A CAPITAL SENTENCING PROCEEDING LACKS THE GUIDED
DISCRETION COMMANDED BY U.S. CONST/ AMEND/ VIII AND XIV
AND OHIO CONST. ART. I, §§ 1, 2, 9, AND 16. WHEN DUPLICATIVE
AGGRAVATING SPECIFICATIONS ARE SUBMITTED FOR THE JURY TO
WEIGH AND CONSIDER AGAINST MITIGATION EVIDENCE.

**Proposition of Law No. 8**

FAILURE OF COUNSEL TO REQUEST MERGER OF DUPLICATIVE
AGGRAVATING CIRCUMSTANCES AND FAILURE TO REQUEST
SPECIFIC INSTRUCTIONS TO THE JURY IN THE PENALTY PHASE,
WHEN SUPPORTED BY THE FACTS OF THE CASE AND THE LAW,
DENIES A CAPITAL DEFENDANT THE RIGHT TO THE EFFECTIVE
ASSISTANCE OF COUNSEL. U.S. CONST., AMEND. VI AND XIV; OHIO
CONST. ART. I, §§ 1, 2, 10 AND 16.

**Proposition of Law No. 9**

FAILURE TO FILE GENERAL CONSTITUTIONAL MOTIONS TO
DISMISS IN A DEATH PENALTY CASE CONSTITUTES INEFFECTIVE
ASSISTANCE OF COUNSEL, EVEN WHERE ALL OF THE ARGUMENTS
WHICH WOULD HAVE BEEN ASSERTED IN SUCH A MOTION HAVE
BEEN OVERRULED BY THE COURTS OF OHIO. U.S. CONST., AMEND.
VI AND XIV; OHIO CONST., ART. I, §10.

**Proposition of Law No. 10**

CONVICTION OF AN INCOMPETENT DEFENDANT VIOLATES
DUE PROCESS UNDER THE U.S. CONST. AMEND. XIV AND THE

ABILITY TO HAVE A FAIR TRIAL, OHIO CONST. ART. I, §§ 1, 2, 10, AND 16; FURTHER, FAILURE OF A CRIMINAL DEFENDANT'S COUNSEL TO CHALLENGE A FINDING OF COMPETENCE TO STAND TRIAL WHEN THERE IS A GOOD FAITH FACTUAL PREDICATE CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL. U.S. CONST. AMEND. VI AND XIV; OHIO CONST., ART. I, §§ 1, 2, 10, AND 16.

### Proposition of Law No. 11

WHEN THE TRIAL COURT INSTRUCTS THE JURY THE VICTIM IS OF A CERTAIN AGE, THE COURT IMPERMISSIBLY DIRECTS A VERDICT AGAINST THE DEFENDANT ON THAT ELEMENT, IN VIOLATION OF THE PRESUMPTION OF INNOCENCE AND DUE PROCESS OF LAW. U.S. CONST., AMEND. V AND XIV; OHIO CONST., ART. I, §§ 10 AND 16.

### Proposition of Law No. 12

USE OF A PHYSICAL RESTRAINT THAT PRODUCES AN ELECTRIC SHOCK DURING TRIAL WITHOUT ANY FACTUAL BASIS FOR DOING SO VIOLATES THE FAIR RIGHTS GUARANTEED BY THE U.S. CONST., AMEND. VI AND XIV AND BY OHIO CONST., ART. I, §§ 2, 10, AND 16.

### Proposition of Law No. 13

DEATH BY LETHAL INJECTION VIOLATES U.S. CONST., AMEND. VII AND XIV AND OHIO CONT., ART. I, §§ 1, 2, 9, AND 16 BECAUSE LETHAL INJECTION CAUSES UNNECESSARY PAIN, AND IT THEREFORE VIOLATES THE FUNDAMENTAL STANDARDS OF DECENCY OF A MATURING SOCIETY AS EXPRESSED IN THOSE CONSTITUTIONAL PROVISIONS.

### Proposition of Law No. 14

BECAUSE "DEATH-QUALIFIED" JURIES ARE MORE CONVICTION-PRONE THAN OTHER CRIMINAL JURIES, AND GIVEN THE NEED TO INSURE RELIABILITY IN THE PROCESS OF DECIDING WHETHER A CAPITAL DEFENDANT SHOULD RECEIVE THE DEATH PENALTY, THE NUMBER OF PEREMPTORY CHALLENGES IN A CAPITAL CASE IS TWELVE PER SIDE. U.S. CONST., AMEND. VI AND XIV; OHIO CONST., ART. I, §§ 1, 10, AND 16; OHIO REVISED CODE ANN. § 2945.21 (A)(2).

### Proposition of Law No. 15

REFERENCE TO THE CAPITAL JURY PENALTY PHASE VERDICT AS A "RECOMMENDATION" VIOLATES THE CONSTITUTIONAL COMMAND THAT A DEATH SENTENCE BE RELIABLY DETERMINED. U.S. CONST., AMEND. VIII AND XIV; OHIO CONST., ART. I, §§ 1, 2, 9, 10 AND 16; *CALDWELL V. MISSISSIPPI* (1985), 472 U.S. 320,…, FOLLOWED; *STATE V. POINDEXTER* (1988), 36 OHIO ST.3D 1,…, OVERRULED IN PART.

### Proposition of Law No. 16

-8-

PERMITTING THE INTRODUCTION OF PHOTOGRAPHS WHICH
ARE SHOCKING AND GRUESOME DEPRIVES A DEFENDANT OF A FAIR
TRIAL BY AN IMPARTIAL JURY AND DUE PROCESS OF LAW. U.S.
CONST., AMEND. VI AND XIV; OHIO CONST., ART. I, §§ 10 AND 16.

**Proposition of Law No. 17**

THE CUMULATIVE EFFECT OF ERRORS DENY A CRIMINAL
DEFENDANT FAIR TRIAL AND DUE PROCESS; ACCORDINGLY,
NEITHER CONVICTIONS NOR SENTENCES MAY STAND UNDER U.S.
CONST. AMEND. XIV AND OHIO CONST. ART. I, §§ 1, 2, 9, 10, AND 16.

(Apx. Vol. 3, pg. 92 - 472; continued to Vol. 4, pg. 1- 77).

The Ohio Supreme Court affirmed the trial court's decision on November 17, 2004.

However, the court vacated and dismissed the felony kidnapping count with regard to Ashley

Cook, and vacated and dismissed the kidnapping specification as to each victim. (Apx. Vol. 4, pg.

287); *State v. Adams*, 103 Ohio St.3d at 513.

Adams filed a Motion for Reconsideration on November 24, 2001. (Apx. Vol. 4, pg. 313).

On December 29, 2004, the Ohio Supreme Court denied this Motion. (Apx. Vol. 4, pg. 328).

Thereafter, on January 7, 2005, Adams filed a Motion for Stay of Execution Pending Appeal to the

Ohio Supreme Court. (Apx. Vol. 4, pg. 335).  The United States Supreme Court granted the

Motion on January 13, 2005. (Apx. Vol. 4, pg . 342). Adams then filed a Petition for Writ of

Certiorari in the United States Supreme Court, which was denied on May 16, 2005. (Apx. Vol. 4,

pg. 345).

**Post-conviction Relief**

On January 6, 2003, Adams filed a Motion for Post-conviction Relief with the trial court

under R.C. § 2953.21, raising the following five causes of action.

**First Cause of Action**

THE PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO
REMAIN SILENT AND HAVE COUNSEL PRESENT.

**Second Cause of Action**

TRIAL COUNSEL WAS INEFFECTIVE F OR FAILING TO FILE A MOTION
TO SUPPRESS
**Third Cause of Action**
PETITIONER DID NOT MAKE A KNOWING, VOLUNTARY AND
INTELLIGENT WAIVER OF HIS CONSTITUTIONAL RIGHTS
**Fourth Cause of Action**
TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE TO
SUPPRESS STATEMENTS MADE AFTER PETITIONER'S SEIZURE
**Fifth Cause of Action**.
PETITIONER WAS DENIED HIS RIGHT TO REPRESENTATION BECAUSE
HE WAS NOT PERMITTED TO MEET PRIVATELY WITH HIS COUNSEL

(Apx. Vol. 5, pg. 37). The trial court denied the petition without permitting discovery or

conducting a hearing on the merits on March 26, 2003.  (Apx. Vol. 5, pg. 279).

Adams filed his Notice of Appeal to the Eleventh District Court of Appeals on April 25,

2003, raising the following four assignments of error.

**Assignment of Error No. 1:**
THE TRIAL COURT ERRED IN DENYING THE PETITION
WITHOUT CONDUCTING AN EVIDENTIARY HEARING WHEN
APPELLANT SUPPLIED SUFFICIENT EVIDENTIARY MATERIAL
CORROBORATIVE OF THE ALLEGATIONS IN HIS PETITION.
**Assignment of Error No. 2:**
THE TRIAL COURT ERRED IN DENYING THE PETITION
WITHOUT CONDUCTING AN EVIDENTIARY HEARING ON THE CLAIM
OF A VIOLATION OF APPELLANT'S *MIRANDA* AND *EDWARDS* RIGHTS.
**Assignment of Error No. 3:**
THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT AN
EVIDENTIARY HEARING ON HIS CLAIM THAT HE WAS DENIED
MEANINGFUL ACCESS TO COUNSEL.
**Assignment of Error No. 4:**
THE TRIAL COUNSEL ERRED IN DENYING THE PETITION
WITHOUT CONDUCTING AN EVIDENTIARY HEARING ON
APPELLANT'S CLAIM THAT HE WAS UNDER A DISABILITY CAUSED
BY EPILEPSY.

(Apx. Vol. 6, pg. 30). The court of appeals affirmed the trial court's decision on January 28, 2005.

(Apx. Vol. 6, pg 132; *State v. Adams*, 2005 WL 238144 (Ohio App. 11th Dist. Jan 28, 2005).

-10-

On March 11, 2005, Adams filed a Notice of Appeal to the Ohio Supreme Court (Apx. Vol. 7, pg. 3). He raised two propositions of law.

**Proposition of Law No. 1:**
THE DOCTRINE OF *RES JUDICATA* MAY NOT BE LICENTIOUSLY APPLIED IN POST-CONVICTION RELIEF PROCEEDINGS TO INCLUDE SITUATIONS WHERE A PARTY COULD HAVE BUT DID NOT MAKE CERTAIN EVIDENTIARY MATERIAL PART OF THE TRIAL RECORD, FOR TO DO SO IS TO DENY MEANINGFUL ACCESS TO THE COURTS. SEE U.S. CONST., AMEND. XIV; OHIO CONST., ART. 1, §§ 1, 2, AND 16. *RES JUDICATA* MAY ONLY BE APPLIED WHEN REVIEWING THE TRIAL RECORD AS IT EXISTS, NOT AS IT COULD HAVE EXISTED.

**Proposition of Law No. 2:**
OHIO REV. CODE ANN. §2953.21 ENFORCES THE CONSTITUTIONAL GUARANTEES OF U.S. CONST., AMEND. XIV AND OHIO CONST., ART. I, §§ 1, 2, AMD 16, AND PRESUMES THAT A HEARING WILL BE HELD ON A PETITION FOR POST-CONVICTION RELIEF UNLESS THE PETITION AND EVIDENTIARY MATERIALS INDICATE THAT A VALID CLAIM HAS NOT BEEN STATED.

(Apx. Vol. 7, pg. 6). On April 7, 2005, the State filed a Memorandum in Opposition to Jurisdiction. (Appendix Vol. 7, p. 54). The Ohio Supreme Court declined jurisdiction and dismissed the appeal on June 29, 2005. (Apx. Vol. 7, p. 73); *State v. Adams*, 106 Ohio St.3d 1414 (2005).

### III. Federal Habeas Corpus

On August 1, 2005, Adams filed a Notice of Intent to File a Petition for Writ of Habeas Corpus.  His Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 was filed on May 19, 2006 raising the following twenty claims for relief.

**FIRST CLAIM FOR RELIEF**
Conviction of an Incompetent Defendant Violates Due Process-counsel Ineffective in Not Challenging a Finding of Competence.

**SECOND CLAIM FOR RELIEF**
Improper First Phase Jury Instructions that Relieves the State from Proving Each Element of the Offense Beyond a Reasonable Doubt.

**THIRD CLAIM FOR RELIEF**

-11-

Use of a Stun Belt Without Sufficient Cause Nor any Factual Basis Justifying its Use.

## FOURTH CLAIM FOR RELIEF

The Use of Lethal Injection Constitutes Cruel and Unusual Punishment Under the Eighth Amendment.

## FIFTH CLAIM FOR RELIEF

Use of the Term "recommendation" by the Trial Court During the Penalty Phase.

## SIXTH CLAIM FOR RELIEF

Fact Finder Reliance on Invalid Aggravated Factor.

## SEVENTH CLAIM FOR RELIEF

Racially Motivated Peremptory Strikes by Prosecutor in Violation of *Batson v. Kentucky*.

## EIGHTH CLAIM FOR RELIEF

Ineffective Assistance of Appellate Counsel for Failure to Pursue *Batson* Claim.

## NINTH CLAIM FOR RELIEF

Failure of Trial Court to Conduct Hearing on Post Conviction Petition Where Movant has Supplied Sufficient Evidentiary Material to Corroborate Allegations Contained in Petition.

## TENTH CLAIM FOR RELIEF

Trial Counsel's Failure to Seek Suppression of Petitioner's *Miranda* and *Edwards* rights.

## ELEVENTH CLAIM FOR RELIEF

Denial of Meaningful Access to Counsel, in Private, without the Presence of Law Enforcement Officers.

## TWELFTH CLAIM FOR RELIEF

Inability of Petitioner, Due to His Epileptic Condition, to Voluntarily, Knowingly and Intelligently Waive Constitutional Rights and Trial Counsel's Failure to Adequately Investigate the Epileptic Condition.

## THIRTEENTH CLAIM FOR RELIEF

Ineffective Assistance of Trial Counsel for Failing to Move to Suppress Petitioner's Statements.

## FOURTEENTH CLAIM FOR RELIEF

Trial Court's Failure to Conduct Preliminary *Daubert* Inquiry and Insist on Necessary Foundation of the State's DNA Evidence.

## FIFTEENTH CLAIM FOR RELIEF

Juror Misconduct.

## SIXTEENTH CLAIM FOR RELIEF

Failure to Receive a Fair and Impartial Trial due to Pre-trial Publicity.

## SEVENTEENTH CLAIM FOR RELIEF

Ineffective Assistance of Counsel in Jury Selection for Failure to Conduct Meaningful Inquiry on Death Qualification.

## EIGHTEENTH CLAIM FOR RELIEF

Duplicative Aggravating Circumstances Presented in Jury Weighing Aggravation against Mitigation.

**NINETEENTH CLAIM FOR RELIEF**
Ineffective Assistance of Counsel for Failure to Offer Specific Mitigating Factors
for the Jury to Weigh Against Aggravating Circumstances.
**TWENTIETH CLAIM FOR RELIEF**
Ineffective Assistance of Counsel for Failure to Raise Constitutional Objections to
the Death Penalty.

On June 6, 2006, Adams amended his Petition withdrawing the seventh and eighth grounds.  (ECF

17).

## IV. Standard of Review

Adams filed his Petition on May 19, 2006, well after the effective date of the Anti-

Terrorism and Effective Death Penalty Act (hereinafter "AEDPA"). Consequently, the Court will

utilize this standard when analyzing Adams's claims. The AEDPA changed federal habeas corpus

law in several important respects. Among the most significant of these changes is the standard of

review to be applied to state court legal and factual determinations. Under the Act:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim—
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the State
>> court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), set forth the

standard of review a federal habeas court must apply under § 2254(d).[1] The Supreme Court

---

[1]

    This decision displaced the Sixth Circuit's prior efforts in *Nevers v. Killinger*, 169
    F.3d 352, 361–62 (6th Cir. 1998) and *Maurino v.*
      *Johnson*, 210 F.3d 638, 643–44 (6th Cir. 2000) to clarify this aspect

provided definitions for the phrases "contrary to," "unreasonable application of," and "clearly established federal law" in § 2254(d)(1). *Id.*

The Supreme Court first pointed out that the phrases "contrary to" and "unreasonable application of" must be given independent meanings. *Id.* at 404–05. A state court decision can be "contrary to" the Supreme Court's clearly established precedent in two ways: (1) "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law," and (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that decision. *Id.*

The *Williams* Court also stated that the word "contrary" "is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Id.* Thus, § 2254 "suggests that the state court's decision must be substantially different from the relevant precedent of [the Supreme Court]." *Id.* The Supreme Court suggested that this phrase would be applicable if the state court applies a rule that contradicts the governing law set forth in prior Supreme Court cases, such as if a state court were to hold that, in order to establish an ineffective assistance of counsel claim, a defendant must prove by a preponderance of the evidence, instead of only a "reasonable probability," that the results of the trial would have been different. *Id.* at 405–06.

The Supreme Court held that an "unreasonable application" occurs when "the state identifies the correct legal principle from this Court's decision but unreasonably applies that

---

of the statute. *See Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000). The Court finds that, to the extent Respondent cited this case law in her brief, it is inapplicable to this proceeding.

-14-

principle to the facts of the prisoner's case."² *Id.* at 410, 413 ("For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.") (emphasis in original). *See also Bell v. Cone*, 535 U.S. 685, 698-99 (2002)(holding that, for a petitioner to succeed on a habeas claim, "he must do more than show that he would have satisfied [the applicable Supreme Court] test if his claim were being analyzed in the first instance, because under 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state court applied [Supreme Court precedent] incorrectly . . . . Rather, he must show that the [state court] applied [Supreme Court precedent] to the facts of his case in an objectively unreasonable manner.").

The Supreme Court also pointed out that, to determine the reasonableness of the state court's decision, a court must employ an objective test, not a subjective one. The *Williams* Court, thus, rejected the Fourth Circuit's holding that a state court's application of federal law was only unreasonable "if the state court has applied federal law in a manner that reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 376. The Court reasoned that this test was too

---

² The Supreme Court also discussed a second aspect of the Fourth Circuit's test to determine whether the state court "unreasonably applied" applicable precedent. *Williams*, 529 U.S. at 406. The second part of the Fourth Circuit's test provided that a state court "unreasonably applies" Supreme Court precedent "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to                      extend that principle to a new context where it should apply." *Id.* The Supreme Court had reservations about this prong of the test, because it was imprecise and could be difficult to apply. The Court stated that, "although that holding may perhaps be correct, that classification does have some problems of precision." *Id.* at 408. Finding that the case in front of it did not require the Court to reach this issue, the Williams Court decided to leave for another day how such "extension of legal principle" cases should be treated.

subjective because a court might "rest its determination . . . on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." *Id.* at 410.

The *Williams* Court also provided further guidance for the phrase "clearly established holdings of the Supreme Court." *Id.* at 412. The Court stated that this statutory phrase "refers to the holdings as opposed to its dicta, of this Court's decisions as of the time of the relevant state-court decision." *Id.* The Sixth Circuit has noted that "this provision marks 'significant change' and prevents the district court from looking to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law. . . ." *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000) (quoting *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

The *Williams* Court referred to the jurisprudence it has developed under *Teague v. Lane*, 489 U.S. 288 (1989), to help guide federal courts as to what qualifies as "clearly established Federal law."*Williams*, 529 U.S. at 412. The Court stated "[w]hatever would qualify as an 'old rule' under *Teague* will constitute 'clearly established Federal law, as determined by [this] Court.'" *Id.* Under *Teague*, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301. Thus, a case announces a new rule if the result was not predicated on precedent existing at the time the defendant's conviction became final. *Id.* "In determining whether the relief requested would constitute a new rule, the question becomes, 'whether a state court considering [the petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.'" *Harris*, 212 F.3d at 944

-16-

(quoting *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994)); *Saffle v. Parks*, 494 U.S. 484, 488 (1990).

## V. Exhaustion and Procedural Default

### A. Exhaustion

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding. 28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982). Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust*, 17 F.3d at 160.

Claims that were never raised at any juncture of the state-court proceedings are both unexhausted and procedurally defaulted because no Ohio court has had an opportunity to decide them. If a habeas petitioner sought to return to state court and attempted to present new claims to the Ohio Supreme Court, that court would find them procedurally barred. "The Ohio Supreme Court has stated that it will not consider constitutional claims not raised and preserved in the Ohio Court of Appeals." *Fornash v. Marshall*, 686 F.2d 1179, 1185 n.7 (6th Cir. 1982), (citing *State v. Phillips*, 272 N.E.2d 347, 352 (Ohio 1971)). Thus, Adams's failure to raise a claim to the Ohio court of appeals would preclude Ohio Supreme Court review. This preclusion, in turn, would prevent Adams from satisfying the exhaustion requirement as the Ohio Supreme Court has not had

-17-

a "fair and full opportunity" to review these claims as *Rust* requires.[3]

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)(quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001(internal quotation marks omitted). Rather than dismiss certain claims the court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile. *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001). In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim. *Buell*, 274 F.3d at 349. To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits. *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000),(citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

### B. Procedural Default

For purposes of comity, a federal court may not consider "contentions of federal law that are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). If a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate

---

[3]

The Court also notes that the *Perry* rule, discussed *infra*, would bar on grounds of *res judicata* an Ohio court from considering any issue that could have been, but was not, raised on direct appeal.

-18-

cause for the default and actual prejudice as a result of the alleged violation of federal law, or

demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991). As the United States Supreme Court

recently explained, "[t]he procedural default rule is neither a statutory nor a constitutional

requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to

respect the law's important interest in the finality of judgments." *Massaro v. United States*, 538

U.S. 500, 504 (2003).

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit Court of Appeals set

out the analytical framework for determining the defaulted status of a claim: "When a state argues

that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the

federal court must go through a complicated [four-prong] analysis." *Id.* at 138. Specifically, the

Sixth Circuit stated:

> First, the court must determine that there is a state procedural rule that is
> applicable to the petitioner's claim and that the petitioner failed to comply with
> the rule . . . . Second, the court must decide whether the state courts actually
> enforced the state procedural sanction . . . . Third, the court must decide
> whether the state procedural forfeiture is an "adequate and independent" state
> ground on which the state can rely to foreclose review of a federal constitutional
> claim. [Fourth, if] the court determines that a state procedural rule was not
> complied with and that rule was an adequate and independent state ground,
> then the petitioner must demonstrate . . . that there was "cause" for him to not
> follow the procedural rule and that he was actually prejudiced by the alleged
> constitutional error.

*Id.* (citations omitted).

The Respondent asserts that all or part of seven claims raised in the Petition are barred

from review by this Court because they are procedurally defaulted. The Court will address each

individual claim of procedural default on that basis. At this time, however, the Court will address

-19-

the Ohio doctrine of *res judicata* pursuant to *State v. Perry*, 226 N.E.2d 104 (Ohio 1967).

Adams argues that Ohio's post-conviction relief system does not meet federal constitutional requirements because of the Ohio Supreme Court's interpretation of the post-conviction statutes in *Perry*. Under the *Perry* doctrine, a final judgment of conviction bars a convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised *or could have been raised* by the defendant at the trial on the merits, or on appeal from that underlying judgment. *Id.* at 108; *see also State v. Roberts*, 437 N.E.2d 598, 601 (1982)(holding policy behind *Perry* bars post-conviction petitioners from raising issues that could have been raised on direct appeal in a collateral proceeding to avoid reversal of conviction based on collateral, rather than constitutional, issues). Thus, unless a claim is based on evidence *dehors* the record, it must be raised during direct appeal, or be deemed waived.

Adams cites no persuasive authority requiring this court to find *Perry* unconstitutional. The Sixth Circuit has expressly found that the *Perry* rule is an adequate and independent state ground to bar a merit review of a petitioner's claim where such claim is asserted in non-compliance with that rule. *Buell*, 274 F.3d at 349 ("This court has held that [the *Perry* rule] is regularly and consistently applied by Ohio courts as required by the four part *Maupin* test.")(citing *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000). *See also Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir. 1999)(noting that the *Perry* rule has been consistently applied); *Brooks v. Edwards*, 1996 WL 506505, at *5 (6th Cir. Sept. 5, 1996)("The procedural rule [of *res judicata*] applicable to petitioner's claims is an adequate and independent state ground for refusal to hear the claim by the Ohio Supreme Court."). Consequently, this Court holds that any claim that the Ohio courts

refused to address based on *Perry* is procedurally defaulted and barred from habeas review absent a showing of cause and prejudice.[4]

Ohio has a contemporaneous objection rule under which an appellant who fails to object waives later review of the issue unless plain error can be shown.  *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004), *cert. denied*, 544 U.S. 1003 (2005) (citing *State v. Smith*, 89 Ohio St.3d 323, 332 (2000)).  The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice. *Id.*; *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Stojetz v. Ishee*, 2006 WL 328155 *12 (S.D. Ohio Feb. 10, 2006).

A state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default. *Williams,* 380 F.3d at 968; *Hinkle*, 271 F.3d at 244. The federal court, in determining whether a state court has relied on a procedural rule to bar review of an issue, examines the latest reasoned opinion of the state courts and presumes that later courts enforced the bar instead of rejecting the claim on the merits. *Hinkle*, 271 F.3d at 244 (citing *Ylst, v. Nunnemaker*, 501 U.S. 797, 803 (1991).

---

[4] The Supreme Court of Ohio recognized an exception to the *Perry* rule in *State v. Hester*, 341 N.E. 2d 304 (Ohio 1976). The *Hester* Court concluded that, where the record does not disclose that the issue of competent trial counsel has been adjudicated, *res judicata* is an improper basis upon which to dismiss an Ohio post-conviction petition. *Id.* at syllabus para. 2. The Ohio Supreme Court subsequently modified the *Hester* exception to the *Perry* rule in *State v. Col*e, 443 N.E.2d 169 (Ohio 1982), finding that:

> Where the defendant, represented by new counsel upon direct appeal fails to raise therein the issue of competent trial counsel, and said issue could fairly have been determined without resort to evidence outside the record, *res judicata* is a properbasis for dismissing defendant's petition for post-conviction relief.

*Id.* at syllabus. These modifications to the *Perry* rule have led federal habeas courts to conclude that Ohio's post-conviction statute, upon which *Perry* rests, satisfies due process. *Morale*s v. *Coyle*, 98 F. Supp. 2d 849, 861 (N.D. Ohio 2000).

-21-

Returning to the issue of procedural default generally, if the district court concludes that the state prisoner has procedurally defaulted his federal claims in state court, federal review is barred unless the prisoner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749.

Demonstrating "cause" requires showing that some factor external to the defense impeded counsel's efforts to comply with the State procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Demonstrating "prejudice" requires showing a disadvantage "infecting" the trial with constitutional error. *United States v. Frady*, 456 U.S. 152, 168 (1982).

Absent cause and prejudice, federal courts may not review issues that are procedurally defaulted unless the petitioner shows that his conviction is the result of a fundamental miscarriage of justice. A fundamental miscarriage of justice is a conviction of one who is "actually innocent." See *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 496. The Supreme Court requires the petitioner to demonstrate not merely a reasonable doubt in light of new evidence, but rather that "it is more likely than not that no reasonable juror would have convicted [the Petitioner] in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The petitioner fails to meet his burden if "at least one juror, acting reasonably and properly instructed would have found" him guilty.[5] *Id.* at 329.

### VI. Individual Grounds for Relief

---

[5]

In ascertaining whether a state court has addressed the merits of a petitioner's constitutional claim, federal courts must rely on the presumption that there is no independent and adequate state ground for the state court decision absent a clear statement to the contrary.

### A. First, Tenth, Twelfth, Thirteenth, Seventeenth, Eighteenth, Nineteenth and Twentieth - Ineffective Assistance of Counsel

Adams alleges ineffective assistance of counsel at both the guilt and penalty phases of trial in his first, tenth, twelfth, thirteenth, seventeenth, eighteenth, nineteenth and twentieth claims for relief. The Court will discuss procedural default as it pertains to each ground for relief as it addresses each individual claim. Here, the Court sets forth the applicable law and standard of review it will apply to each claim.

Counsel's performance during a criminal trial must be sufficient to ensure a defendant's trial was fair. *Strickland v. Washington*, 466 U.S. 668, 685 (1984). To assert a successful ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-prong test for ineffective assistance of counsel set forth in *Strickland*. First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, the petitioner must show that he was prejudiced by counsel's errors. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* Prejudice exists when there is a reasonable probability, that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* 466 U.S. at 694; *Hicks v. Collins*, 384 F.3d 204, 214 (6th Cir. 2004), *cert. denied*, 544 U.S. 1037 (2005).

To demonstrate ineffective assistance of counsel, a petitioner must point to specific errors in counsel's performance. *United States v. Cronic*, 466 U.S. 648, 666 (1984). Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally

competent assistance." *Strickland*, 466 U.S. at 690. A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy. *Id.* at 689. "Judicial scrutiny of a counsel's performance must be highly deferential and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Bell,* 535 U.S. at 698(quoting *Strickland*, 466 U.S. at 689). To ascertain whether counsel's performance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful, but a court must "focus on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

### First Claim for Relief

In his first claim for relief, Adams asserts that his counsel were ineffective for failing to challenge Adams's competence to stand trial. Adams had three competency examinations which were allegedly inadequate. He contends that counsel should have sought a more extensive competency examination. The Respondent concedes that this claim was properly presented to the Ohio courts and is preserved for federal habeas review.

Adams's counsel requested a determination of competency before trial. The court and defense each selected a psychologist while the prosecutor utilized a psychiatrist. The Ohio Supreme Court addressed this claim as follows, finding it to be without merit.

> In proposition of law X, Adams argues that his counsel provided ineffective assistance by failing to adequately challenge at trial the competence of Adams to stand trial when a good-faith basis existed to do so.
> Before trial, counsel requested a determination of competency. The court selected clinical psychologist Dr. Stanley J. Palumbo, the defense selected psychologist Dr. Douglas C. Darnall, and the prosecutor selected a psychiatrist, Dr. Steven J.

-24-

Zuchowski. After interviewing Adams and examining relevant records, each expert found Adams competent to stand trial. At a pretrial conference, the parties stipulated to the competency-evaluation reports and agreed that each expert would testify as his report indicated. The court then found Adams competent to stand trial. Admittedly, a person who "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri* (1975), 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103. "Fundamental principles of due process" prohibit trial of a criminal defendant who is legally incompetent. *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, citing *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815.

Although Adams suggests that he was not competent to stand trial, he primarily argues that his counsel provided ineffective assistance by not pursuing the issue. Nonetheless, we find that Adams has not established deficient performance. Counsel's decision to stipulate to the content of three competency evaluations and not cross-examine these experts or otherwise challenge the competence of Adams was grounded on a reasoned tactical judgment.

First, the record reflects no basis to challenge the reports. The competency reports were comprehensive and satisfied the statutory requirements for competency evaluations. See R.C. 2945.371(G). Each expert explained in detail why Adams was competent to stand trial. For example, Dr. Palumbo interviewed Adams for two hours and reviewed other relevant records such as his own September 1996 evaluation of Adams. After reviewing relevant history, Dr. Palumbo articulated detailed reasons for concluding, "with reasonable scientific certainty, [that] Stanley Adams is presently able to understand the nature and objective of the proceedings against him and to presently assist in his defense." According to Dr. Palumbo, Adams understood and described the charges against him, the role of witnesses, the judge, the jury, the prosecutor, and the defense counsel, as well as his role as the defendant. Adams also understood types of pleas, the plea-bargain process, and the potential penalties.

Dr. Darnall, the expert selected by Adams, also explained in detail why he could "find no evidence of a significant mental disorder that would hinder [Adams's] capacity to understand the judicial process or to contribute to his own defense." Dr. Zuchowski detailed five reasons why he found that Adams understood the nature and objective of the proceedings against him and eight specific reasons why Adams could assist his lawyers. Although all three experts reported that Adams had abused drugs and alcohol, no one diagnosed any psychosis or mental limitations that would affect the competence of Adams to stand trial.

Under R.C. 2945.37(G), "[a] defendant is presumed to be competent to stand trial." This presumption remains valid under R.C. 2945.37(G) unless "after a hearing, the court finds by a preponderance of the evidence" that the defendant is not competent. Faced with these strong conclusions that Adams was competent to be tried, counsel reasonably decided to stipulate to their testimony and not challenge the presumption of competency. When judging professional decisions of counsel,

"a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

Second, counsel knew their client and could best determine if he understood the trial process and was able to assist them in the defense. Counsel could also decide if cross-examination of the experts or further evaluations were needed. See *State v. Williams*, 99 Ohio St.3d 439, 2003- Ohio-4164, 793 N.E.2d 446, at ¶ 63; *State v. Spivey* (1998), 81 Ohio St.3d 405, 410-411, 692 N.E.2d 151. We grant deference on these issues to those "who see and hear what goes on in the courtroom." *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298.

Third, later events at trial vindicated counsel's decision not to challenge the competence of Adams. During the trial, Adams made a pro se request for witnesses to be recalled, personally asked for an additional DNA test, and argued about a polygraph examination. These personal requests by Adams demonstrated his understanding of the trial process and his ability to assist his defense. In addition, the fact that Adams at times complained about tactical decisions that his lawyers made also established that Adams understood the trial process and was fully engaged in his defense.

Further, Adams "displayed no outrageous, irrational behavior during trial, and counsel never complained about his lack of cooperation." State v. Williams, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, at ¶ 63. "[I]t is noteworthy that nobody on the spot thought [that the defendant's] behavior raised any question as to his competence." (Emphasis sic.) *State v. Cowans*, 87 Ohio St.3d at 84, 717 N.E.2d 298. Cf. *State v. Thomas*, 97 Ohio St.3d 309, 316, 779 N.E.2d 1017; *State v. Vrabel*, 99 Ohio St.3d 184, 2003- Ohio-3193, 790 N.E.2d 303, ¶ 29-32; *State v. Carter* (2000), 89 Ohio St.3d 593, 603-605, 734 N.E.2d 345.

Finally, nothing in the record suggests prejudice, which Strickland requires. The record fails to reflect any reasonable probability that if counsel had cross-examined the experts or requested further evaluations, the trial court's decision that Adams was competent would have been different. See *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Accord *State v. Williams*, 99 Ohio St.3d 439, 2003- Ohio-4164, 793 N.E.2d 446, at ¶ 66. Thus, we overrule proposition X.

*State v. Adams*, 103 Ohio St.3d at 521-24. The Ohio Supreme Court thoroughly addressed this

issue, summarizing the opinion of each expert that Adams understood the charges against him.

None of them diagnosed any psychosis or mental limitations. Further, there is nothing before the

Court showing that another opinion would result in a different evaluation. The decision by the

Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established

federal law as determined by the Supreme Court of the United States.

### Tenth and Thirteenth Claims for Relief

Adams contends that his counsel were ineffective for failing to file a motion to suppress non-custodial and custodial statements made to police. The tenth claim contains the issue of non-custodial interrogation while the latter issue was set forth in the thirteenth claim for relief. As both claims were presented to the Ohio Supreme Court, the Respondent concedes that they have been preserved for federal habeas review.

Adams allegedly made statements to law enforcement officers while ostensibly not in custody, which were made at a law enforcement office with officers present but without counsel. Trial counsel, through discovery, were aware of these statements and their importance to the State's case, but refused to file a motion to suppress them. After his arrest, Adams made incriminating statements without being informed of his constitutional rights.

The Ohio Supreme Court addressed this claim stating:

> In proposition of law I, Adams argues that his counsel provided ineffective assistance by failing to file a motion to suppress pretrial statements that Adams made to the Warren police on October 20, 1999. In those audiotaped and videotaped statements, Adams admitted that he had discovered the bodies of Esther and Ashley, but he denied any responsibility for their deaths.
> For Adams to obtain a reversal of a conviction or sentence based on ineffective assistance of counsel, he must prove (a) deficient performance ("errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment") and (b) prejudice ("errors * * * so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"). *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.
> We conclude, however, that Adams's claim of ineffective assistance of counsel lacks merit. First, Adams has not demonstrated deficient performance. Trial counsel cannot be second-guessed as to trial strategy decisions. In fact, the " '[f]ailure to file a suppression motion does not constitute per se ineffective assistance of counsel.' " *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52, quoting *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct.

-27-

2574, 91 L.Ed.2d 305. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674. Moreover, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. In this case, counsel for Adams appear to have made a tactical judgment that the best way to defend Adams would be to permit his strong claims of innocence to be admitted into evidence. In these October 20 statements, Adams persistently denied any thefts from the house, any sexual contact with the victims, and any responsibility for their deaths.

Counsel's trial strategy took advantage of the fact that Adams strongly proclaimed to police before trial that he was innocent of these charges. To illustrate this strategy, defense counsel in his opening statement noted that two "trained, experienced police officers" subjected Adams to "an intense interrogation * * * for almost three hours." Counsel further noted "[t]here are no less than accusations of assaults, beatings, on these two decedents, and there are just as many explained denials by Stanley that, 'I did not do this, I did not have anything to do with this.' " In closing argument, counsel resumed this strategy by stressing Adams's protestations of innocence, e.g., "Stanley does not waiver [sic], and his statement remains the same, I didn't do this."

By deciding not to attempt to suppress these pretrial statements, counsel had the benefit of having Adams's exculpatory explanation of events in evidence, without the risk of having Adams take the stand in his own defense. By not testifying, Adams never had to face a prosecutor's cross-examination. Further, Adams never had to face devastating impeachment by means of his prior felony convictions, which included a recent murder conviction. See, e.g., *State v. Beckett* (May 11, 2001), Holmes App. No. 00CA008, 2001 WL 520970 ("[b]y allowing the admission of [pretrial] statements to police * * *, counsel was able to present this defense * * * without putting appellant on the witness stand"); *People v. Newman* (Mich. App.2000), 2000 WL 33522090 (allowing into evidence a voluntary, exculpatory pretrial statement is a matter of trial strategy, not ineffective assistance).

Second, in order to demonstrate deficient performance, Adams must establish that a basis existed to suppress his pretrial statements. See, e.g., *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 165-166, 749 N.E.2d 226 (where the record contains no evidence justifying a motion to suppress, defendant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion). In fact, the record strongly indicates that counsel would have been unsuccessful in attempting to suppress Adams's pretrial statements. Police advised Adams of his Miranda rights by reading the form to him, and Adams freely signed a waiver of those rights. Adams said that he understood his rights, and the record shows that his Miranda waiver and ensuing statements were voluntary. The audiotaped and videotaped statements reveal that Adams remained in control of himself throughout the interview by persistently and strongly claiming his innocence. Police never

threatened or coerced Adams, and Adams never asked for a lawyer or expressed
reluctance to talk with police. Moreover, at the time of the offense, Adams was 33
years old and experienced in the criminal justice system.

Under the totality-of-circumstances test, the facts show that Adams understood and
voluntarily waived his Miranda rights and that his pretrial statements to police in
which he proclaimed his innocence were voluntary and admissible. See *State v.
Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two
of the syllabus. See, also, *State v. Green* (2000), 90 Ohio St.3d 352, 366, 738
N.E.2d 1208; *State v. Eley* (1996), 77 Ohio St.3d 174, 178, 672 N.E.2d 640; *State
v. Brewer* (1990), 48 Ohio St.3d 50, 57-58, 549 N.E.2d 491.

Third, counsel for Adams could also have decided that any motion to suppress
Adams's statements to the police would have been pointless. Adams told several
others, including a friend, his sister, and his former girlfriend, that he had
discovered one or both of the bodies on the night of October 11.

Finally, Adams has not established that any prejudice resulted from the admission
into evidence of his pretrial statements to police. "To show that a defendant has
been prejudiced by counsel's deficient performance, the defendant must prove that
there exists a reasonable probability that, were it not for counsel's errors, the result
of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538
N.E.2d 373, paragraph three of the syllabus. In this case, the conviction of Adams
did not hinge on evidence of his exculpatory pretrial statements because
compelling evidence established his guilt. Thus, we reject proposition of law I.

*State v. Adams*, 103 Ohio St.3d at 513-15.

In *Miranda v. Arizona*, 384 U.S. 436 (1966),  the United States Supreme Court concluded
that the Fifth Amendment protects persons in all settings in which their freedom is curtailed in any
significant manner from being compelled to incriminate themselves. *Id.* at 467.  An individual
under investigation in custody and accused of a crime is under severe pressure to speak where he
or she would not otherwise do so. *Id.* To alleviate these pressures and to permit a person to
exercise his or her Fifth Amendment privilege against self-incrimination, the accused must be
adequately informed of his rights and the exercise of those rights must be honored. *Id.*

The United States Supreme Court held in *Edwards v. Arizona,* 451 U.S. 477, 484-485
(1981), that an accused having expressed his desire to deal with the police only through counsel, is
not subject to further interrogation by the authorities until counsel has been made available to him,

unless the accused himself initiates further communication, exchanges, or conversations with the police.

A  failure to file a suppression motion does not constitute *per se* ineffective assistance of counsel. However, the decision must amount to a sound trial strategy and not counsel's mistaken understanding of the law. *Kimmelman v. Morrison*, 477 U.S. 365, 384-85 (1986). In order to succeed on the prejudicial aspect of a claim of ineffective assistance of counsel for failure to file a motion to suppress, a defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence, *Id.* at 375.

First, the record shows that Adams was informed of his *Miranda* rights and he indicated that he understood and voluntarily waived those rights. (Tr. Vol. 13, pg. 3070).  Second, counsels' decision not to file a motion to suppress can be considered sound trial strategy.  "By deciding not to attempt to suppress these pretrial statements, counsel had the benefit of having Adams's exculpatory explanation of events in evidence, without the risk of having Adams take the stand in his own defense. By not testifying, Adams never had to face a prosecutor's cross-examination. Further, Adams never had to face devastating impeachment by means of his prior felony convictions, which included a recent murder conviction." *State v. Adams*, 103 Ohio St.3d at 514. Third, as the Ohio Supreme Court found, Adams's counsel could also have decided that any motion to suppress Adams's statements to the police would have been pointless. Adams told several others, including a friend, his sister, and his former girlfriend, that he had discovered one or both of the bodies on the night of October 11. *Id.*

Adams had previously asserted his *Miranda* rights and then at a later date he was readvised

of his rights and waived them.  The Sixth Circuit has held that the *Edwards* rule does not apply to suspects who are not in continuous custody. *Kyger v. Carlton*, 146 F.3d 374, 380-81 (6th Cir. 1998).  There was no *Miranda or Edwards* violations in Adams's case.  The tenth and thirteenth claims for relief are without merit.

### Twelfth Claim for Relief

In his twelfth claim for relief, Adams asserts that his counsel were ineffective for failing to investigate his epileptic condition and inability to waive his *Miranda* rights.  This claim was presented in post-conviction proceedings to the Eleventh District Court of Appeals which found it to be barred by *res judicata*. Therefore, although the court fully addressed this claim, this Court finds that it is procedurally defaulted for purposes of this federal habeas review.

The Eleventh District Court of Appeals stated:

> In this matter, appellant alleges that he had an epileptic seizure in a holding cell shortly before being questioned on October 20, 1999. Appellant provided his own affidavit in support of this argument. However, appellant provided no evidence, other than his own self-serving affidavit, indicating that he actually suffered from epilepsy, was prone to seizures, or had a seizure on that particular day. Appellant also failed to indicate prejudice.

> In his appellate brief, appellant argues that the detectives were aware of his seizure. Our careful review of the record reveals nothing which indicates a seizure or demonstrates that appellant was suffering from any disability, especially a recent epileptic seizure. Further, Detective Nites testified that appellant was able to effectively communicate during the interview.

Appellant has submitted no evidence corroborating his claim, and his own self-serving affidavit cannot compel a hearing. *State v. Combs* (1994), 100 App.3d 90, 98, citing *State v. Kapper* (1983), 5 Ohio St.3d 36, 37-38, 448 N.E.2d 823. Accordingly, appellant failed to meet his burden to demonstrate a cognizable claim of constitutional error. It was well within the trial court's discretion to doubt appellant's credibility and deny him a hearing on this claim. See, e.g., *Jackson* at 112, 413 N.E.2d 819. Appellant's fourth assignment of error is without merit.

*State v. Adams*, 2005 WL 238144 *11- 12 (Ohio App. 11th Dist. Jan. 28, 2005).

-31-

There is nothing in the record showing that Adams had a seizure before he was interrogated or that he has epilepsy or any other medical condition.  The taped interview of the police interrogation shows him to be conscious and aware. There is no indication that Adams was impaired during his interview that would require investigation by his counsel. Thus, he has not shown that counsel were ineffective in this regard.

### Seventeenth Claim for Relief

In his seventeenth claim for relief, Adams contends that his right to a fair and impartial trial was violated by his trial counsels' failure to conduct a meaningful and probing inquiry of prospective jurors during voir dire concerning their knowledge of his prior unrelated conviction for murder and the legally permissible attitudes concerning the death penalty.  This claim was presented to the Ohio Supreme Court and is preserved for federal habeas review.

The Ohio Supreme Court found this claim to be without merit.

In proposition of law V, Adams asserts that his counsel provided ineffective assistance by conducting an incomplete voir dire examination of prospective jurors. As we noted, reversal of a conviction or sentence based on ineffective assistance requires finding both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373.

We reject this claim for several reasons. First, Adams has not shown deficient performance by counsel during voir dire. In fact, defense counsel, along with the court and prosecutor, conducted an extensive voir dire for 11 days. Voir dire eliminated those who were biased and those who would not be fair jurors in a death-penalty case.

Nonetheless, Adams argues that his counsel did not adequately question jurors Eucker, Jagiella, and Griffin about their death-penalty views. But "[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042. Accord *State v. Seiber* (1990), 56 Ohio St.3d 4, 12, 564 N.E.2d 408. We "will not second-guess trial strategy decisions" such as those made during voir dire. *State v. Mason*, 82 Ohio St.3d at 157, 694 N.E.2d 932.

-32-

In fact, the court and counsel fully questioned these particular jurors about their death-penalty views. For example, the death-qualification voir dire for Eucker took over 30 pages of transcript. Eucker expressed "no problem" with the death penalty, thought that it "has a place in our society," but had "never given [it] a lot of thought." He understood that taking a life does not automatically result in the death penalty, and he was open to both the death penalty and life imprisonment. He would do only "what the law and the evidence requires" and would "listen to the instructions and set aside [his] own personal opinions." He would decide on death only if the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Defense counsel did not challenge Eucker for cause.

Counsel and the court also extensively questioned Kenneth Griffin about his death-penalty views. Griffin believed that the death penalty was "there for a reason." But when asked if he had strong views, he responded, "No, not really." As possible mitigating factors, Griffin mentioned mental problems or the influence of drugs or alcohol. He agreed to follow the court's instructions, and believed that "if the mitigating factors * * * outweigh the aggravating circumstances, then that is where the sentencing should be." He would not "automatically head for a death penalty" if the defendant was convicted. Again, neither side challenged this juror.

Counsel and the court also extensively questioned Edward Jagiella. Jagiella believed that if it is proved "beyond a shadow of a doubt" that a person killed somebody "with malice," and "they're not mentally ill," that person "deserve[s] the death penalty." But Jagiella stated that he could set aside his opinions and follow the court's instructions. He agreed that society would be protected either by a killer's execution or by a life sentence. Jagiella agreed to consider all mitigating factors, including "Adams's character, the way he was brought up, and * * * [whether] he was mentally ill." He would "listen to all of the facts," consider the credibility of witnesses, and "reserve judgment on everything until everything is in." Again, neither counsel challenged Jagiella for cause.

Adams also complains about counsel's voir dire of alternate juror Jamie Nezbeth. But Nezbeth never sat as a juror and was excused for unrelated reasons during the mitigation hearing.

We conclude that the questioning of all jurors, including the three named by Adams, was thorough and meaningful. Thus, Adams has not shown deficient performance. Counsel "need not repeat questions about topics already covered by * * * opposing counsel, or the judge." *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97. Further, "[c]ounsel were present for voir dire and could see and hear the jurors answer questions. [They] were in a much better position" to judge such issues. *State v. Bradley*, 42 Ohio St.3d at 143, 538 N.E.2d 373. We have previously rejected similar challenges to the manner in which counsel questioned jurors during voir dire. See, e.g., *State v. Goodwin* (1999), 84 Ohio St.3d 331, 335, 703 N.E.2d 1251 (counsel's decision "not to question jurors further" about their death-penalty views was an "exercise of their discretionary judgment"); *State v. Evans*, 63 Ohio St.3d at 247, 586 N.E.2d 1042 (ineffective assistance not

established by the fact that counsel in general voir dire only briefly asked jurors about their attitude concerning the death penalty).

Finally, Adams has not established that prejudice resulted from the manner in which counsel voir dired Eucker, Jagiella, and Griffin. To establish prejudice requires proving that "a reasonable probability [exists] that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Adams has not even attempted to demonstrate that more extensive questioning of Eucker, Griffin, and Jagiella would have created a "reasonable probability" of a different trial result. Accordingly, we reject proposition V.

*State v. Adams*, 103 Ohio St.3d at 520-21.

The Ohio Supreme Court examined Adams's attorney's questioning and found it to be satisfactory. Contrary to Adams's contention, jurors were asked if they would follow the law. The Court finds that the decision of the Ohio court was not contrary to, or an unreasonable application of federal law as established by the United States Supreme Court.

### Eighteenth Claim for Relief

Adams alleges that his trial counsel were ineffective for failing to object and request merger of duplicative aggravating circumstances presented to the jury during the trial phase and penalty phase. This underlying claim was presented to the Ohio Supreme Court which noted that counsel failed to object and waived the issue. It is procedurally defaulted pursuant to Ohio's contemporaneous objection rule and for failure to raise the ineffective aspect of the claim in the Ohio courts. If the Court were to consider this claim, it would find it to be without merit.

The underlying claim is discussed below in Adams's sixth claim for relief. Because the underlying claim will be found to lack merit, counsel were not ineffective for failing to raise the claim at trial. The Court finds that the decision of the Ohio court was not contrary to, or an unreasonable application of, federal constitutional law as determined by the United States

-34-

Supreme Court

## Nineteenth Claim for Relief

Adams contends that his counsel were ineffective for failing to argue for jury instructions during the penalty phase of the trial detailing specific mitigating factors for the jury to weigh against aggravating circumstances. The Respondent concedes that this claim was presented to the Ohio Supreme Court on direct appeal and is preserved for federal habeas review.

According to Adams, the trial court instructed the jury as to a number of aggravating circumstances to be weighed on the side of imposition of the death penalty. With regard to mitigating factors to be weighed on the side of life, the trial court offered only a general instruction about what may constitute mitigation. Counsel were allegedly ineffective for failing to ask the court to instruct on the strong, compelling factors which would have mitigated successfully against imposition of the death penalty.

The trial court correctly instructed the jury as to aggravating circumstances and mitigating factors. In *Bowling v. Parker*, 344 F.3d 487, 503 (6th Cir. 2003), the trial court's general instructions requiring the jury to consider evidence they find to be mitigating was held to be sufficient. There was no reason to assume that the jury did not consider the mitigating evidence submitted by defense counsel. "The mere fact that the jury was not given a particularized instruction on EED or mental illness, as opposed to a more generalized one, is simply not a constitutional wrong." *Id.*  Based on *Bowling,* the Court finds that this claim is without merit.

## Twentieth Claim for Relief

In his twentieth claim for relief, Adams asserts that his counsel were ineffective because

they failed to raise constitutional objections to Ohio's death penalty statutes. Adams presented this claim to the Ohio Supreme Court. Thus, it is preserved for federal habeas review.

The Supreme Court has held the death penalty to be constitutional. *Gregg v. Georgia*, 428 U.S. 153, 179 (1976).  In *Gregg*, the Supreme Court rejected the argument that the death penalty is cruel and unusual punishment. *Wiles v. Bagley*, 2005 WL 1181859 at * 43 (N.D. Ohio May 18, 2005); *Jackson v. Anderson* 141 F. Supp.2d 811, 878 (N.D. Ohio 2001).  An indication of society's endorsement of the death penalty for murder is the legislative response to the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972). Since *Furman*, the legislatures of at least 35 states have enacted new statutes that provide for the death penalty for at least some crimes that result in the death of another person.  The Congress of the United States, in 1974, enacted a statute providing the death penalty for aircraft piracy that results in death. These statutes have attempted to address the concerns expressed by the Court in *Furman* primarily (i) by specifying the factors to be weighed and the procedures to be followed in deciding when to impose a capital sentence, or (ii) by making the death penalty mandatory for specified crimes. But all of the post-*Furman* statutes make clear that capital punishment itself has not been rejected by the elected representatives of the people. *Gregg*,  428 U.S. at 179-81. Ohio's death penalty statutes satisfy the concerns identified in *Furman*.

### B. Second, Third, Fifth, Sixth, Ninth, Eleventh, Fourteenth, Fifteenth and Sixteenth - Trial Court Error

### Second Claim for Relief

Adams alleges that the trial court instructed the jury that Ashley Dawn Cook, at the time of the offense, was twelve years old, thereby relieving the State from proving each element beyond a

reasonable doubt.  Although Adams's counsel raised this issue after the court instructed the jury, the Ohio Supreme Court ruled that the claim was waived because Adams's counsel did not timely object to the court's instructions. As a result, the court discussed the issue under plain error, finding it to be without merit. On the basis of Ohio's contemporaneous objection rule, the Court finds this claim to be procedurally defaulted. If it were to be considered, the Court would find it to be without the merit.

The Ohio Supreme Court stated as to merits of this claim:

In proposition of law XI, Adams argues that the trial court erred by referring to "Ashley Dawn Cook, Age 12," in the instructions on Count 2 and in death-penalty specification 7 in Counts 1 and 2. Adams points out that Ashley's age was an element of these offenses and an issue of fact for the jury. Her age was also relevant as an issue of fact in Count 5.

Due process requires the state to prove beyond a reasonable doubt every element of the charged offense. *In re Winship* (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368. Jury instructions that effectively relieve the state of its burden of persuasion violate a defendant's due process rights. *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39; *Rose v. Clark* (1986), 478 U.S. 570, 580, 106 S.Ct. 3101, 92 L.Ed.2d 460.

In this case, the trial court's initial trial-phase instructions, which concerned Counts 5 through 8, the kidnapping and rape charges, did not list Ashley's age as 12 years. For those charges, the court instructed that whether Ashley was "under 13 years of age" or "under the age of 13" was an issue of fact for the jury. Adams does not complain about that part of the instructions.

Later, the court instructed the jury on the elements of death-penalty specification 7, murder of a child under 13 in violation of R.C. 2929.04(A)(9), in Counts 1 and 2. On those specifications, the court instructed the jury that to "find the Defendant guilty * * * you must find that the State has proven beyond a reasonable doubt that the Defendant * * * did purposely cause the death of Ashley Dawn Cook, age 12, who was under 13 years of age at the time of the [murder]." Adams now argues that the trial judge in effect instructed the jury that Ashley was in fact 12 years old, when the jury had the responsibility to make a finding of fact on that issue.

****

Further, we conclude that the instruction did not foreclose the jury's role. The reference to Ashley as "age 12" came in the context of the trial court's instructions to the jury as to the charge as stated in the indictment. The court then properly

-37-

instructed the jury that the state had to prove the victim's age. When considered in the context of the entire instructions, the jury would not have understood the instruction as requiring it to accept that Ashley was 12 years old, without making the required factual finding. See *Estelle v. McGuire* (1991), 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385.

At worst, the instruction was ambiguous and did not constitute plain error, because the outcome of the trial was not affected by the reference to Ashley's age. *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Compelling evidence, including Ashley's death certificate, as well as testimony at trial, proved that Ashley was 12 years old when she was murdered. No evidence at trial contradicted that fact. Accordingly, we regard the issue raised in proposition XI waived.

*State v. Adams*, 103 Ohio St.3d at 528-29.

There was sufficient evidence in the record showing that Ashley Cook was twelve years old when she was murdered. Her age was referred to at trial, (Tr. Vol. 11, pg. 2529); her death certificate which included her age was admitted into evidence, (Tr. Vol. 16, pgs. 3782-84); and the autopsy report stated her age as twelve at the time of her death. (Tr. Vol. 16, pgs. 3809-10).

Further, the court instructed the jury that they had to find that Ashley Cook was under the age of thirteen. (Tr. Vol. 17, pgs, 4125, 4147, 4172, 4183).

The Court finds that the decision of the Ohio court was not contrary to, or an unreasonable application of, federal constitutional law as determined by the United States Supreme Court.

### Third Claim for Relief

Adams contends that the court had no justification for having a stun belt placed on him during trial.  After voir dire, but prior to the commencement of the trial, the State approached the court and requested the use of the stun belt as a security measure to prevent any outbursts or demonstrations by Petitioner.  Counsel objected because it would have a psychological and physiological impact on Petitioner, as he is an epileptic and a seizure could be caused or

-38-

aggravated by an electrical shock. The court allegedly ignored these factors and without a hearing,

permitted the placement of the stun belt on Adams. The claim, having been presented to the Ohio

Supreme Court, is preserved for federal habeas review.

The Ohio Supreme Court found as follows:

In proposition of law XII, Adams argues that the trial court improperly authorized
the use of an electronic restraint on him, a "Band-It" belt that could be activated to
produce an electric shock if Adams was disruptive in court. Adams argues that the
trial court violated his right to a fair trial because the court authorized fitting the
device on him without a factual basis for doing so.

With respect to customary physical restraints such as handcuffs or leg shackles, we
have long recognized that "no one should be tried while shackled, absent unusual
circumstances." *State v. Kidder* (1987), 32 Ohio St.3d 279, 285, 513 N.E.2d 311.
"However, shackling is left to the trial court's sound discretion." *State v. Richey*
(1992), 64 Ohio St.3d 353, 358, 595 N.E.2d 915, citing *State v. Woodards* (1966),
6 Ohio St.2d 14, 23, 35 O.O.2d 8, 215 N.E.2d 568. The trial court must exercise its
own discretion and not leave the issue up to security personnel. See, e.g., *Woodards
v. Cardwell* (C.A.6, 1970), 430 F.2d 978, 981-982. Accord *State v. Cassano,* 96
Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 54. Courts have upheld restraints
in trials of defendants with a documented history of violence or escape attempts.
See, e.g., *Harrell v. Israel* (C.A.7, 1982), 672 F.2d 632, 636; *Kennedy v. Cardwell*
(C.A.6, 1973), 487 F.2d 101, 105, fn. 5.

Courts elsewhere have upheld the use of electronic stun belts when specifically
justified. See, e.g., *State v. Powell* (2002), 274 Kan. 618, 56 P.3d 189 (factors
justifying use include serious nature of charges, history of institutional violence,
history of verbal or physical assaults); *United States v. McKissick* (C.A.10, 2000),
204 F.3d 1282, 1299 (without evidence that jury knew that defendants were
wearing stun belts, court will not presume prejudice). Accord *Scieszka v. State*
(2003), 259 Ga.App. 486, 578 S.E.2d 149 (where no prejudice is shown, use of stun
belt not abuse of discretion); *Simms v. State* (Tex.App.2004), 127 S.W.3d 924.
Other courts have reversed when stun belts have not been amply justified on the
record. See, e.g*., Gonzalez v. Pliler* (C.A.9, 2003), 341 F.3d 897; *People v. Mar*
(2002), 28 Cal.4th 1201, 124 Cal.Rptr.2d 161, 52 P.3d 95; United *States v. Durham*
(C.A.11, 2002), 287 F.3d 1297. Further, the Supreme Court of Indiana has flatly
declared that "stun belts may not be used on defendants in the courtrooms of this
State." *Wrinkles v. State* (Ind.2001), 749 N.E.2d 1179, 1194. In Ohio, this device
has been used previously in some capital cases. See, e.g., *State v. Filiaggi* (1999),
86 Ohio St.3d 230, 238, 714 N.E.2d 867.

In this case, the trial court conducted a hearing on September 6, 2001, and heard

-39-

arguments of counsel and statements from security personnel before authorizing the use of this security device. Further, the record shows that the trial court had a factual basis for authorizing the device.

First, Chief Deputy Cook of the Sheriff's Office explained, at the hearing, that the Band-It device would produce an electric shock only "if the Defendant embarks on an escape attempt, an assault, or other violent behavior." Further, Cook explained that the device is "non-lethal, it's short-term and it incapacitates." There is also "an audible alert tone that actually tells the Defendant it's going to go off, so he's got some discretion on whether to pull back." The trial court noted that it "does absolutely zero harm" when not activated. Although Adams suffers from epilepsy, no medical evidence indicated that he was at additional risk if the device was activated. Nor did evidence establish that his ability to assist counsel was impaired.

Second, because Adams was wearing clothing over the device, the device was not visible to the jury and, unless it was activated, the jury would not know that it was being worn. The record does not reflect that it was activated in this trial. In contrast, leg irons or shackles always present a risk that jurors will inadvertently discover the restraints and possibly be influenced in deliberations. See, e.g., *Illinois v. Allen* (1970), 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353. In this case, the jury learned about the device only when Adams personally complained about having to wear it when he made an unsworn statement during the penalty phase.

Third, the trial court explained its decision to authorize the Band-It device in an entry. The court explained that in November 2000, Adams had been convicted of an unrelated murder and rape and had been sentenced to 25 years to life. Adams also had a "lengthy criminal record and [had] been imprisoned on at least four (4) prior occasions." The trial court found that based on jail reports, Adams "may pose a risk of escape." Also, according to Dr. Darnall, Adams had "difficulty in adequately controlling his frustration and anger." Adams told Dr. Darnall, "[I]f I get close to it, I am gonna sucker [punch] them [his previous attorneys]. * * * I am going to get the satisfaction and knock the f* * *ing shit out of him." According to Dr. Zuchowski, Adams could control his behavior, but "his personality traits, particularly impulsivity and irritability, make courtroom outbursts a possibility."

On the foregoing basis, we conclude that the trial court did not abuse its discretion in authorizing this device to be used on Adams during his trial. Cf. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 81 (defendant's past violent behavior and psychologist's description of him as a "time bomb" justified shackling in penalty phase); *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 55 (convicted violent felon, murder occurred in prison). Accordingly, we overrule proposition XII.

*State v. Adams*, 103 Ohio St.3d at 529-31.

The restraint of a defendant through the use of a stun belt involves the same fundamental issues as are involved in shackling. *United States v. Waagner*, 2004 WL 1595193 * 4 (6th Cir. Jul.

14, 2004). See *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir.2002) ("[S]tun belts plainly pose many of the same constitutional concerns as do other physical restraints, though in somewhat different ways.") The Ninth Circuit has held that the imposition of stun belts on defendants at trial more severely impacts those rights than are impacted by the imposition of shackles-- including the right to participate in one's own defense. *Gonzales v. Pliler*, 341 f3d 897, 901 (9th Cir. 2003)(noting that the severe physical effects of a stun belt's activation could seriously impair the defendant's ability to testify on her behalf or otherwise participate in her own defense).

The Constitution prohibits the use of shackles unless there exists an essential state interest, such as the interest in courtroom security. *Deck v. Missouri*, 544 U.S. 622, 623 (2005).  Of course, there may be a need to restrain dangerous defendants. *Id*. at 632.  Whether or not to use shackles (or a stun belt) depends on the circumstances of the particular case. *Id.*  The defendant must show prejudice to prove a due process violation. *Id*. at 635. Harmless error applies requiring the state to prove beyond a reasonable doubt that the shackling (stun belt) did not contribute to the verdict obtained. *Id.*

The Sixth Circuit has formulated four factors to be considered in determining whether to use shackles. They are: 1) the defendant's record, his temperament, and the desperateness of his situation; (2) the state of both the courtroom and the courthouse; (3) the defendant's physical condition; and (4) whether there is a less prejudicial but adequate means of providing security. *Lakin v. Stine*, 431 F.3d 959, 964 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1925 (2006); *Waagner*, 2004 WL 1595193 at * 4 (citing *Kennedy v. Cardwell*, 487 F.2d 101, 110-11 (6th Cir.1973)).

In Adams's case, the court conducted a hearing on September 6, 2001.  After arguments by

-41-

counsel and statements from security personnel, the court ordered placement of the stun belt. The court heard of Adams's prior conviction for rape and murder and the fact that he had been imprisoned at least four times. *See Lakin*, 431 F.3d at 963 (shakling defendant without individualized determination as to its necessity violates due process). Further, he threatened to attack his previous attorneys. The device was placed out of sight under his clothing. The jury was not aware of its presence until Adams remarked about it in his unsworn statement during the penalty phase.   Thus, it clearly was the least of any potentially prejudicial, but adequate means of providing courtroom security.

Even if a due process violation occurred, harmless error applies. In *Lakin,* the court found improper use of shackles to be harmless error because evidence of guilt was overwhelming. *Id*. 431 F.3d at 966.   The same reasoning applies in Adams's case. The decision of the Ohio court was not contrary to, or an unreasonable application of, federal constitutional law as determined by the United States Supreme Court.

**Fifth Claim for Relief**

In his fifth claim for relief, Adams asserts that the court's reference in its penalty phase jury instructions that its verdict was a recommendation lessened the jury's sense of responsibility and thus undermines any reliability in the process of imposing a death sentence.  The Respondent agrees that this claim was presented to the Ohio courts and is preserved for federal habeas review.

The same issue was before the Sixth Circuit in *Buell*, 274 F.3d at 353. The court found it to be without merit stating:

> Unlike in *Caldwell v. Mississippi*, 472 U.S. 320 [1985], where the jury was given
> the uncorrected impression that the appellate courts would make the final decision

-42-

on the imposition of a death sentence, not merely review the appropriateness of the jury's decision to impose a death sentence, Buell has not demonstrated that the instructions at his trial improperly described the role assigned to the jury by local law. In instructing the jury that they are to make a recommendation as to a death sentence, and that the final decision regarding imposition of a death sentence rests with the trial court, the jury instruction complied with the letter of Ohio law and described with complete accuracy the jury's role in the sentencing process. By doing so, the jury's sense of responsibility was not diminished.

*Slaughter v. Parker*, 450 F.3d 224, 240 (6th Cir. 2006)(instruction that the jury only recommends a death sentence is constitutional unless the defendant shows that the instruction improperly describes the role assigned to the jury by local law); *Byrd v. Collins*, 209 F.3d at 527 (these instructions reflect Ohio statutory law); *Scott v. Mitchell*, 209 F.3d 854, 877 (6th Cir. 2000)(same). The decision of the Ohio court was not contrary to, or an unreasonable application of, federal constitutional law as determined by the United States Supreme Court.

### Sixth Claim for Relief

Adams was convicted of the aggravated murder of Esther Cook and Ashley Cook with several specifications, including a kidnapping specification, which made him eligible for the death penalty. He was also convicted of felony kidnapping of Ashley Cook. On appeal, the Ohio Supreme Court vacated and dismissed both the felony kidnapping charge and the kidnapping specification. Adams asserts that as result of the dismissal of those charges, the factfinder improperly considered aggravating circumstances for which he had not been convicted. Further, in attempting to cure the weighing by the jury and trial court, the Ohio Supreme Court re-weighed the aggravating circumstances against the mitigating factors, absent the kidnapping charges as to both victims. This claim was not submitted to the Ohio Court and is procedurally defaulted. *See Martin v. Mitchell*, 280 F,3d 594, 603 (6th Cir. 2002) (if a claim presented in the federal court was

never actually presented in the state courts, but a state procedural rule now prohibits the state

court from considering it, the claim is considered exhausted, but is procedurally barred). If it were

to be considered, the Court would find it to be without merit.

The Ohio Supreme essentially conducted a plain error consideration of this claim.

In proposition of law VII, Adams asserts that his rights were violated because duplicative death specifications were submitted for the jury to weigh and consider against mitigation evidence.

Duplicative death-penalty specifications should be merged when they "arise from the same act or indivisible course of conduct." *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. However, when the offenses illustrate a separate animus and do not show an indivisible course of conduct, merger is not required. See, e.g., *State v. Robb* (2000), 88 Ohio St.3d 59, 85, 723 N.E.2d 1019 (court need not merge 2929.04[A][4], [A][5] or [A][7] specifications); *State v. Williams* (1996), 74 Ohio St.3d 569, 579, 660 N.E.2d 724 (offenses in [A][7] and [A][5] death specifications are not duplicative in that case).

As we have discussed in connection with proposition VI, no separate animus existed as to the asserted kidnapping of Ashley, and we have vacated the findings of guilt as to the death-penalty kidnapping specifications in Counts 1 and 3. We will consider that failure of proof in our independent assessment of the penalty. See *State v. Mitts* (1998), 81 Ohio St.3d 223, 232, 690 N.E.2d 522; *State v. Garner*, 74 Ohio St.3d at 53, 656 N.E.2d 623; *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70.

In other particulars, however, we conclude that Adams's complaint about duplicative death-penalty specifications lacks merit. First, counsel failed to object and thus waived the issue. *State v. Underwood,* 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

Second, the specifications were not duplicative for punishment purposes, and counsel were not ineffective for not raising the issue. Murder while committing a felony, such as aggravated burglary, R.C. 2929.04(A)(7), and during a course of conduct of purposeful killing, R.C. 2929.04(A)(5), as charged in Count 1 and Count 3, are not duplicative. See, e.g., *State v. Smith*, 80 Ohio St.3d at 116, 684 N.E.2d 668; *State v. Williams*, 74 Ohio St.3d at 579, 660 N.E.2d 724.

Third, murder of a person specifically protected because of status, such as a child, is not duplicative of other death specifications. See *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 199-200 ("course of conduct," [A][5], and murder of police officer, [A][6], are not duplicative); *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 141 (death of a child, [A][9], is not duplicative of [A][3] or [A][7] ). Further, rape by fellatio and vaginal rape are

separate offenses under R.C. 2941.25(B), even when one is "followed immediately by" the other. *State v. Barnes* (1981), 68 Ohio St.2d 13, 14, 22 O.O.3d 126, 427 N.E.2d 517. Accord *State v. Jones* (1997), 78 Ohio St.3d 12, 676 N.E.2d 80.

*State v. Adams*, 103 Ohio St.3d at 533-34.

The Ohio Supreme Court vacated the kidnapping of Ashley charge because no separate animus existed.  It further correctly found that the murder of a person specifically protected by status, such as a child, is not duplicative of other death specifications.

The United States Supreme Court held in *Parker v. Dugger*, 498 U.S. 308 (1991), that "in a weighing state[6], when a reviewing court strikes one or more of the aggravating factors on which the sentencer relies, the reviewing court may, consistent with the Constitution, reweigh the remaining evidence or conduct a harmless error analysis." *Id.* citing *Clemons v. Mississippi*, 494 U.S. 738, 741, (1991).  The Court stated in *Clemmons*:

> We see no reason to believe that careful appellate weighing of aggravating against mitigating circumstances in cases such as this would not produce "measured consistent application" of the death penalty or in any way be unfair to the defendant. It is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases in "weighing" states, to consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed.

*Clemons*, 494 U.S. at 748- 49.  *See Cooey v. Coyle*, 289 F.3d 882, 888 (6th Cir. 2002). The Sixth Circuit follows *Clemons* and *Parke*r in holding that reweighing by the Ohio Supreme Court under Ohio Rev.Code § 2929.05(A) satisfies the requirements of *Clemons* when the court either eliminates impermissible aggravating factors or adds overlooked mitigating factors. *Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006).

Under Ohio Rev.Code § 2929.05(A), the Ohio appellate courts are required to

_____

[6]

Adams cites *Brown v. Sanders*, 126 S.Ct. 884 (2006). This case does not apply here as it involves a non-weighing state.

"independently weigh" the aggravating circumstances against the mitigating factors:

> The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate.

See *Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003)(both Supreme Court precedent and Ohio law allow reweighing by the appellate courts when the sentencer has considered an invalid aggravating circumstance).  Recently, the Supreme Court noted that in a weighing state, the sentencer's consideration of an invalid eligibility factor necessarily upsets its balancing of the aggravating circumstances with the mitigating factors requiring reversal of the sentence unless a state appellate court determined the error was harmless or reweighed the mitigating evidence against the valid aggravating factors. *Brown v. Sanders,* 126 S. Ct. 884, 890 (2006). This claim is without merit.

### Ninth Claim for Relief

In his ninth claim for relief, Adams contends that he should have been granted an evidentiary hearing in post-conviction proceedings.  His post-conviction petition alleged a variety of errors committed during his trial. The petition allegedly presented sufficient evidentiary material that should have compelled the Ohio courts to schedule a hearing.  Adams appealed the trial court's denial of an evidentiary hearing to the Ohio court of appeals and the Ohio Supreme Court. Four claims were presented to the appellate court: that the trial court erred in denying him a hearing when he had sufficient evidence; that the court erred in denying a hearing on Adams's *Miranda* and *Edwards* violations; the court erred in denying a hearing on Adams's claim of denial

-46-

of meaningful access to counsel; and the trial court erred in denying a hearing on a claim of disability caused by epilepsy. On appeal Adams did not raise the claims regarding access to counsel or disability from epilepsy to the Ohio Supreme Court. Thus, the latter two claims are procedurally defaulted. See *Buell,* 274 F.3d at 349 (a petitioner cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court.); *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001)(where a federal habeas corpus petitioner has not fully and fairly presented a federal claim to the state's highest court, or when state courts have held that consideration of petitioner's claim is barred due to the procedural default, a federal court ordinarily will not consider the merits). *Coleman*, 244 F.3d at 538.

Post-conviction proceedings are civil rather than criminal proceedings. *Murray v. Giarratano,* 492 U.S. 1, 13 (1989). A state has no obligation to provide post-conviction review. *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001). Therefore, unless state collateral review violates some independent constitutional right, such as equal protection, challenges to a state's post-conviction procedures are not cognizable as independent claims in habeas corpus proceedings. *Clark v. McLemore*, 291 F. Supp.2d 535, 542 (E.D. Mich. 2003) (citing *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996)).

Ohio law does not provide for an automatic evidentiary hearing on the claims raised in post-conviction petitions. *State v. Jackson,* 64 Ohio St.2d 107 (1980). Ohio Revised Code Section 2953.21(C) provides for an evidentiary hearing if the court determines through affidavits, documentary evidence, and all the files and records pertaining to the proceedings against the defendant that there are substantive grounds for relief. *Jamison v. Collins,* 100 F. Supp.2d. 521,

567 (S. D. Ohio 1998). Substantive grounds for relief exist when there are reasonable grounds to believe that the judgment against the defendant is void or voidable under the Ohio Constitution. R.C. 2953.21(A). The evidence submitted by the petitioner to the Ohio court must meet some threshold standard of cogency. *State v. Lawson*, 103 Ohio App.3d 307, 315 (Ohio App. 12th Dist. 1995); *State v. Hill*, 2005 WL 1490362 * 2 (Ohio App. 2nd Dist. Jun. 24, 2005).

Further, a petition for writ of habeas corpus is not the proper method for a criminal defendant to challenge errors or deficiencies in state post-conviction proceedings because the claims usually address collateral matters and not the underlying conviction giving rise to the defendant's incarceration. *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986).

As Adams has not shown any constitutional deprivation, this claim must fail.

### Eleventh Claim for Relief

Adams contends that he was denied meaningful access to his counsel when he was unable to communicate with his counsel without the presence of law enforcement officers who were ostensibly present for security purposes. Although presented to the Ohio Eleventh District Court of Appeals, Adams did not raise the issue before the Ohio Supreme Court, the State's highest court. Therefore, it is procedurally barred for federal habeas review. If it were to be considered, the Court would find the claim to be without merit.

The United States Supreme Court has held that intentional intrusion on the right to confidential communication violates the Sixth Amendment when there is potential or actual prejudice to the defendant. *Weatherhead v. Bursey*, 429 U.S. 545 (1977); *United States v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984). Even a deliberate intrusion does not constitute a Sixth Amendment violation in the absence of prejudice. *United States v. Morrison*, 449 U.S. 361, 365

(1981).

In *Lakin v. Stine,* 2000 WL 1256900 * 4 (6th Cir. Jul. 13, 2000), Lakin asserted that guards were present during his conversation with his attorney but he did not state how this intrusion limited his communication with counsel or prejudiced his case. *Id.*  Even though on one occasion Lakin refused to discuss his case with counsel because of the guard's presence, the court found no constitutional violation.

Adams has not explained how he was prejudiced or how his case was affected by the presence of law enforcement officers during his communications with his counsel. Following *Weatherhead*, *Morrison* and *Lakin*, the Court finds this claim to be without merit.

### Fourteenth Claim for Relief

In his fourteenth claim for relief, Adams asserts that the trial court improperly failed to conduct a hearing in accordance with the United States Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), or otherwise require a proper foundation of the methodology, qualifications and statistical analysis as to the State's DNA evidence. This claim having been presented to the Ohio Supreme Court has been preserved for federal habeas review.

Errors involving state evidentiary matters, especially rulings regarding the admission or exclusion of evidence, usually are not reviewable in federal habeas corpus actions. *Estelle, v. McGuir*e, 502 U.S. 62, 67 (1991); *Waters v. Kassulke*, 916 F.2d 329, 335 (6th Cir. 1990); *Jones v. Smith,* 244 F. Supp.2d 810, 814 (E.D. Mich. 2003).  A federal constitutional violation must exist before a federal court will address such issue.  *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994).

*Daubert* involves the requirements of Federal Rule of Evidence 702. Consequently, the

Sixth Circuit has held that *Daubert* does not apply to the states. *Norris v. Schotten*, 146 F.3d 314,

335 (6th Cir 1998). See *Samatar v. Clarridge*, 2006 WL 355684 * 28 (S.D. Ohio Feb. 16, 2006);

*Williams v. Withrow*, 328 F. Supp.2d 735, 745 (E.D. Mich. 2004).

The Ohio Supreme Court's finding on this claim is as follows:

DNA evidence. In proposition of law II, Adams challenges the DNA evidence by claiming that the trial court's admission of scientific or expert testimony and evidence without a preliminary determination of the reliability of the conclusions to be presented violated his fair-trial rights. Adams complains that "the trial court regarded DNA [evidence] as nothing novel" and allowed "junk" testimony to come into evidence. Adams essentially challenges DNA testimony as if trial courts had never accepted DNA evidence before. See Evid.R. 702(C); *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 589-590, 113 S.Ct. 2786, 125 L.Ed.2d 469.

However, we hold that the trial court was not required to conduct a preliminary hearing under Evid.R. 104 to accept the scientific reliability of DNA evidence. DNA evidence is not "novel" to Ohio courts as Adams claims. In *State v. Pierce* (1992), 64 Ohio St.3d 490, 597 N.E.2d 107, at paragraph one of the syllabus, we held that "DNA evidence may be relevant evidence which will assist the trier of fact in determining a fact in issue, and may be admissible." In Pierce, we recognized that "the theory and procedures used in DNA typing are generally accepted within the scientific community." 64 Ohio St.3d at 497, 597 N.E.2d 107. Further, we held in Pierce that "questions regarding the reliability of DNA evidence in a given case go to the weight of the evidence rather than its admissibility. No pretrial evidentiary hearing is necessary to determine the reliability of the DNA evidence. The trier of fact * * * can determine whether DNA evidence is reliable." *Pierce,* 64 Ohio St.3d at 501, 597 N.E.2d 107. (Emphasis added.) Accord *State v. Nicholas* (1993), 66 Ohio St.3d 431, 437, 613 N.E.2d 225 ("DNA results constitute reliable evidence").

To support his claims, Adams cites a variety of studies suggesting limitations on DNA evidence. For example, Adams argues that the court should have excluded DNA evidence because of controversy over (1) "the statistical estimates being offered for Polymerase Chain Reaction (PCR) tests"; (2) "the reliability of the methods used * * * for collecting, handling, processing, and testing crime scene samples"; and (3) "coincidental match probabilities and false error rates."

However, the issues that Adams now raises "go to the weight of the evidence rather than its admissibility." *Pierce,* 64 Ohio St.3d 490, 597 N.E.2d 107, paragraph two of the syllabus. In *Pierce,* we found that the trial court properly admitted calculations as to the frequency probability of DNA samples. *Id.* at 501, 597

-50-

N.E.2d 107. In *Pierce*, we also recognized that "[g]iven the human element involved in their design and process, all scientific procedures and analyses have incidents of error." *Id.* at 498, 597 N.E.2d 107. Further, "[t]he jury was free to reject the DNA evidence if it concluded that the evidence was unreliable or misleading." *Id.* at 501, 597 N.E.2d 107.

Although Evid.R. 702 was amended after *Pierce* to state the reliability requirement, the Staff Note to Evid.R. 702 indicates that "[t]he amendment is intended to clarify the circumstances in which expert testimony is admissible. * * * [N]o substantive change from prior law is intended. In particular, there is no intention to change existing Ohio law regarding the reliability of expert testimony."

Further, we have recognized since Evid.R. 702 was amended that "[r]elevant evidence based on valid principles will satisfy the threshold reliability standard for the admission of expert testimony. The credibility to be afforded these principles and the expert's conclusions remain[s] a matter for the trier of fact. The reliability requirement in Evid.R. 702 is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth." *State v. Nemeth* (1998), 82 Ohio St.3d 202, 211, 694 N.E.2d 1332.

In *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 611, 687 N.E.2d 735, we also emphasized that the reliability inquiry relates to the validity of the underlying scientific principles, not the correctness of the expert's conclusions. See, also, Gerald J. Todaro, The Admissibility of Medical Testimony in Ohio: Daubert, Joiner and Ohio's Relevance-Reliability Standard (1998), 46 Cleve.St.L.Rev. 319, 335 (Nemeth "ultimately continues the relaxed standard imposed by the relevance/reliability approach.").

As we recognized in *Pierce* over 12 years ago, DNA evidence, premised on valid scientific principles, has been widely accepted as reliable and admissible evidence. *Pierce,* 64 Ohio St.3d at 494, 597 N.E.2d 107. "[T]he use of nuclear DNA analysis as a forensic tool has been found to be scientifically reliable by the scientific community for more than a decade." *United States v. Beverly* (C.A.6, 2004), 369 F.3d 516, 528. Courts throughout the nation and in Ohio routinely accept DNA evidence. See George Bundy Smith & Janet A. Gordon, The Admission of DNA Evidence in State and Federal Courts (1997), 65 Fordham L.Rev. 2465, 2482-2483, 2488. See, also, *State v. Satta*, Marion App. No. 9-01-38, 2002-Ohio-5049, 2002 WL 31114690, ¶ 44 ("the credibility of the D.N.A. testing * * * is a matter to [be] determined by the trier of fact"); *State v. Martin* (Aug. 14, 2000), Brown App. No. CA99-09-026, 2000 WL 1145465 ( "Questions regarding the reliability of DNA evidence * * *, including alleged defects or limitations of DNA population frequency statistics, go to weight of the evidence rather than its admissibility"); *State v. Honzu* (June 1, 1995), Franklin App. No. 94AP07- 1011, 1995 WL 326214, * 8 (questions regarding DNA testing procedures go to weight not admissibility). See, also, Smith & Gordon, 65 Cleve.St.L.Rev. at 2470 (PCR analysis [one of several DNA typing techniques] "has received overwhelming acceptance in the scientific community and the courts").

At trial, Adams offered no evidence challenging the DNA evidence or the manner

in which the samples were collected or tested, preferring to rely upon cross-examination of the experts. Although counsel cross-examined the experts at length, counsel did not establish any basis to question the admissibility or the reliability of the DNA evidence in this case. Moreover, counsel for Adams specifically asserted that for strategic reasons, they did not want additional DNA testing because it would not help their client. Finally, as we have long recognized, the admission of expert testimony is within the trial court's discretion. *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444. In this case, the trial court did not abuse its discretion by allowing the DNA experts to testify as such during the trial. Each expert was qualified under Evid.R. 702, and each explained the scientific procedures used. Meghan Clement holds a master's degree in forensic science, had performed thousands of DNA tests, and had testified over 200 times in courts in 24 states. Dr. P. Michael Conneally, a Distinguished Professor of Medical and Molecular Genetics, is a charter member of HUGO, the Human Genome Organization, had published 275 scientific articles, and had testified as an expert witness in 26 states on genetics and DNA subjects. Jennifer Duvall has a bachelor of science degree in biology, had completed an eight-month Ohio DNA training program, had completed analyses of over 1,000 DNA samples, and had testified as an expert witness 15 times. We find no merit in the claim made by Adams that the trial court erred in failing to hold a preliminary hearing on the admissibility of DNA evidence. Hence, we reject proposition II.

*State v. Adams*, 103 Ohio St.3d at 524-26. The Court finds that the decision of the Ohio court was not contrary to, or an unreasonable application of, federal constitutional law as determined by the United States Supreme Court.

### Fifteenth Claim for Relief

In his fifteenth claim for relief, Adams alleges that during voir dire, a juror reported to the court and counsel that she and other jurors overheard a women comment that she had read about the case in the newspaper that morning, that she hoped she would not have to serve and that she believed Petitioner to be guilty.  Despite this incident, counsel failed to object to the venire and the trial court failed to conduct adequate inquiry of the prospective jurors that overheard another juror's comment.  Part of this argument was presented to the Ohio Supreme Court and is preserved for federal habeas review.  Adams did not raise the issue of counsel's failure to object to the

court's failure to hold a hearing. That sub-claim is procedurally defaulted. If the Court were to consider it, the sub-claim would be found to be without merit.

The Ohio Supreme Court stated:

In proposition of law III, Adams argues that because of asserted misconduct by an unknown member of the venire, he was denied a fair trial by an impartial jury. Adams cites an incident that occurred in a jury waiting room during voir dire. Prospective jurors were standing in line to sign a list of those who had heard or read about the case. While in line, a prospective juror, Harriet Dickerson, heard someone behind her comment, "I know we're not supposed to talk about this, but I believe he's guilty. When I looked at the newspaper this morning, I was afraid that I was going to have to be on this case."

Dickerson could not identify the person who made this remark. Dickerson testified that another prospective juror reportedly had heard the comment and said that she "couldn't believe" that someone had said that. During individual voir dire, Dickerson disclosed the incident to the trial court. After briefly questioning Dickerson, defense counsel did not pursue the matter. Although Dickerson was not challenged for cause, she did not sit on the jury.

Admittedly, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips* (1982), 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78. However, *Smith* holds that the party complaining about juror misconduct must establish prejudice. *Id.* at 215-217, 102 S.Ct. 940, 71 L.Ed.2d 78. See *United States v. Zelinka* (C.A.6, 1988), 862 F.2d 92, 95.

We reject the defense claim of prejudicial error for several reasons. First, counsel could reasonably decide that this casual remark in a jury waiting room was innocuous and that no purpose would be served by further inquiry. We do not second-guess trial strategy decisions such as those made by counsel during voir dire. See *State v. Mason* (1998), 82 Ohio St.3d 144, 157, 694 N.E.2d 932. We also reject Adams's claim that the trial court should have, *sua sponte*, conducted a further inquiry. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 115-116, 734 N.E.2d 1237 (on juror misconduct, "we show deference to the trial judge, who sees and hears the events and thus is in a better position to accurately evaluate the situation and determine the appropriate scope of inquiry").

Second, no misconduct by an actual juror occurred in this case. Instead, an unknown prospective juror made a casual comment in a jury-selection waiting room suggesting a preconceived opinion. When this unknown person made this remark, no jury had been seated or sworn, nor had the court instructed jurors on their obligations.

Third, Adams has not established prejudice because the person who made the remark, or anyone who heard it, may never have sat on the jury that tried Adams. "A claim of juror misconduct must focus on the jurors who were actually seated

-53-

and not those excused." *State v. Williams* (1997), 79 Ohio St.3d 1, 4, 679 N.E.2d 646, citing *Ross v. Oklahoma* (1988), 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80. We have a " 'long-standing rule * * * not [to] reverse a judgment because of the misconduct of a juror unless prejudice * * * is shown.' " *State v. Hipkins* (1982), 69 Ohio St.2d 80, 83, 23 O.O.3d 123, 430 N.E.2d 943, quoting *State v. Kehn* (1977), 50 Ohio St.2d 11, 19, 4 O.O.3d 74, 361 N.E.2d 1330. Accord *State v. Keith* (1997), 79 Ohio St.3d 514, 526, 684 N.E.2d 47. Further, under Crim.R. 33(A), juror misconduct justifies a new trial only if it materially affected an accused's substantial rights. See, also, R.C. 2945.79(B).

Finally, the trial court and counsel in this case thoroughly and individually voir dired all prospective jurors in order to uncover any bias, prejudice, or preconceived opinions based on pretrial publicity or out-of-court discussions. This extensive voir dire lasted for 11 days, and the court and counsel readily agreed on those who should be excused. In fact, over 30 prospective jurors were excused because of pretrial publicity or knowledge of the case. Moreover, the trial court thoroughly instructed the jury to avoid pretrial publicity, not to discuss the case, and to decide the issues only on the evidence presented in court. Hence, we reject proposition III.

*State v. Adams*, 103 Ohio St.3d at 516-17.

A state trial court is not obligated to investigate every allegation of bias or juror misconduct on voir dire. *Mu'Min v. Virginia*, 500 U.S. 415, 427, (1991). But a constitutional duty of inquiry arises when "under the circumstances presented there was a constitutionally significant likelihood that, absent questioning about [the potential bias], the jurors would not be as indifferent as (they stand) unsworn," *Ristaino v. Ross*, 424 U.S. 589, 596 (1976), or when "a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury. *Nevers v. Killinger*, 169 F.3d 352, 373 (6th Cir.1999), *overruled on other grounds by Harris v. Stovall*, 212 F.3d 940 (6th Cir.2000).

This claim is without merit. As the State court found, the prospective juror that heard the comment did not sit on the jury.  At the time the comment was made the prospective jurors were standing in line in a jury selection waiting room.  No juror had been seated or sworn and the court had not instructed the jurors on their obligations. The person who made the remark may not have sat on Adams's jury. Adams's counsel thoroughly voir dired all prospective jurors as to their bias,

prejudice or preconceived opinions based on pretrial publicity or out-of-court discussions.  Adams has not shown that he was prejudiced by this incident. The Court finds that the decision of the Ohio court was not contrary to, or an unreasonable application of, federal constitutional law as determined by the United States Supreme Court.

### Sixteenth Claim for Relief

Adams contends that he did not receive a fair and impartial trial due to extensive pretrial publicity,  which impacted adversely on prospective jurors. Because of the adverse pretrial publicity, he asserts that the court should have granted a change of venue as requested by counsel. The Respondent concedes that this issue was presented to the Ohio Supreme Court and is preserved for federal habeas review.

In cases involving pretrial publicity, "[t]he relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount,* 467 U.S. 1025, 1035 (1984). *White v. Mitchell,* 431 F.3d 517, 531 (6th Cir. 2005), *cert. denied*, 127 S. Ct. 578 (2006).  It is sufficient "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dow*d, 366 U.S. 717, 722 (1961).  In *Mu'Min*, 500 U.S. at 422, the Court determined that while a trial court may question potential jurors about their exposure to pre-trial publicity, the court need not inquire about what media coverage each had viewed. *Id.* at 431. A trial court's findings of juror impartiality may be overturned only for manifest error. *Id.* at 428.

The United States Supreme Court has determined that in cases where a media-run "carnival atmosphere" replaces the solemnity and dignity of a courtroom proceeding, a defendant may presume that the media attention so prejudiced his proceeding as to deny him or her due

-55-

process of the law. *Sheppard v. Maxwell*, 384 U.S. 333, 355 (1966). Prejudice is shown through a review of voir dire testimony and the extent and nature of the publicity that a fair trial was impossible. *White*, 431 F.3d at 532. "[I]n extraordinary cases, where the trial atmosphere has been utterly corrupted by press coverage, a court must presume that pre-trial publicity has engendered prejudice in the members of the venire." *Williams,* 380 F.3d at 945. But "mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint." *White*, 431 F.3d at 531, (quoting *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998)).  A fair juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Id.* at 532.

In this case, each of the potential jurors was questioned to ensure that they were not prejudiced by publicity about the case. During individual voir dire, the judge cautioned each juror not to discuss the case or read or listen to media reports. Just before the final jury was selected, the trail court again individually voir dired each remaining prospective juror to ensure that they were still not contaminated by media reports. *State v. Adams*, 103 Ohio St.3d at 518.  Adams pointed to six jurors who he claims may have been adversely affected by pretrial publicity. The Ohio Supreme Court found that the record affirmatively reflects that the pretrial publicity never adversely influenced any of them. Voir dire showed that those who had been subjected to media exposure knew very few details. *Id.*  Individual jury voir dire was extensive in this case and resulted in the seating of jurors who assured the court and the parties that they could impartially judge the case based on the evidence at trial and the judge's instructions. As a result, Adams's claims of jury bias and improper denial of a change of venue do not warrant habeas relief.  The Court finds that the decision of the Ohio court was not contrary to, or an unreasonable application of, federal constitutional law as determined by the United States Supreme Court.

### C. Fourth- Lethal Injection Unconstitutional

In his fourth claim for relief, Adams asserts that lethal injection constitutes cruel and unusual punishment.  The Respondent acknowledges that this claim was presented to the Ohio Supreme Court and that it is preserved for federal habeas review.

Ohio Revised Code Section 2949.22 provides:

> A) Except as provided in division (C) of this section, a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death. The application of the drug or combination of drugs shall be continued until the person is dead. The warden of the correctional institution in which the sentence is to be executed or another person selected by the director of rehabilitation and correction shall ensure that the death sentence is executed.

The Supreme Court has held the death penalty to be constitutional. *Gregg,* 428 U.S. at 179. And lethal injection has been held to be a constitutional method of execution. *LaGrand v. Stewart*, 133 F.3d 1253, 1264 (9th Cir. 1998).  The Ninth Circuit noted that lethal injection is used by 37 of the 38 states that have the death penalty, indicating a national consensus. *Cooper v. Rimmer,* 379 F.3d 1029, 1033 (9th Cir. 2004).  Recently, the Sixth Circuit commented that at this time, lethal injection is the law of the republic. No federal court has found the lethal injection protocol to be unconstitutional.  *Alley v. Little*, 2006 WL 1313365 * 2 (6th Cir. May 12, 2006), *cert. denied*, 126 S. Ct. 2973 (2006). This claim is without merit.

### VIII. CONCLUSION

The Sixth Circuit has determined that a district court need not wait until a petitioner moves for a Certificate of Appealabilty ("COA") before issuing a COA for claims raised in the petition. *Castro v. United States*, 310 F.3d 900 (6th Cir. 2002). There, the court reasoned that, because a

-57-

district judge who has recently denied a writ of habeas corpus will have "an intimate knowledge of both the record and the relevant law and could simply determine whether to issue the certificate of appealability when she denies the initial petition," it follows that a proper time to determine whether to grant a COA is at the conclusion of the opinion granting or denying the writ. *Id.* at 901 (internal quotation marks and citations omitted).

Furthermore, in two other Sixth Circuit decisions, the court held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001)(remanding motion for certificate of appealability for district court's analysis of claims). Thus, in concluding this Opinion, it is now appropriate to determine whether to grant a COA as to any of the claims the petitioner presented in his petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

\*\*\*

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court
\*\*\*
(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole

difference between the pre- and post-AEDPA statutes is that the petitioner now must demonstrate he was denied a constitutional right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre and post-AEDPA versions of the statute in *Slack v. McDaniel*, 529 U.S. 473 (2000). In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute. *Slack,* 529 U.S. at 483. Thus, the Court determined that

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further."

*Id.* at 483-4 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim. If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined procedurally defaulted. In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis supplied).

-59-

After taking the above standard into consideration, the Court finds that there are no issues meriting further review. The Court discusses each claim and its defaulted status below.

Claims two, six, part of nine, eleven, twelve, part of fifteen and eighteen are procedurally defaulted.  Claims two (improper jury instruction) and eighteen (ineffective assistance for failing to object to the merger of duplicative aggravating circumstances) are barred by the contemporaneous objection rule. Claim six (improper consideration of aggravating circumstance) part of claim nine (state court failed to allow an evidentiary hearing on meaningful access to counsel and disability caused by epilepsy) and part of claim fifteen (failure to object to the court's failure to conduct a hearing on a prospective juror's improper comment) are barred because they were never presented to the Ohio courts. Claim eleven (denial of meaningful access to counsel) is barred because it was not raised in the Ohio Supreme Court and claim twelve  (ineffective assistance of counsel for failure to investigate his epileptic condition and his inability to waive his *Miranda* rights) is procedurally barred by the doctrine of *res judicata*. The Court finds that reasonable jurists would not debate the defaulted status of these claims as Adams has not shown cause and prejudice for default. Thus, a COA is denied as to these claims.

If the Court were to have considered the second, sixth, part of the ninth, eleventh, twelfth, part of the fifteenth and the eighteenth claims, it would have found that jurists of reason would not debate this Court's decision on the merits.

The second claim involved the trial court's improper jury instruction that one of the victims was under twelve years old, thereby allegedly relieving the state from proving this element. This Court determined that the evidence sufficiently showed that the victim was twelve years old and that the court instructed the jury that they had to find that the victim was under age thirteen. The Court finds that jurists of reason would not debate this Court's decision as to

-60-

Adams's second ground for relief.

The Court finds that jurists of reason would not debate this Court's decision as to Adams's sixth claim for relief  (improper consideration of aggravating circumstance). Reweighing by the Ohio Supreme Court is permissible when improper aggravating circumstances have been eliminated.

In the ninth claim for relief, Adams contended that he should have been granted a hearing in post-conviction relief proceedings.  The claim was found to be without merit because a state has no obligation to provide post-conviction review and Ohio law does not provide for an automatic evidentiary hearing on the claims raised in post-conviction proceedings. The Court finds that jurists of reason would not debate this Court's decision as to Adams's ninth ground for relief.

In his eleventh claim for relief, Adams asserted that he was denied meaningful access to counsel during his trial. The Court finds that jurists of reason would not debate the Court's decision as to this claim as Adams failed to show how his case was affected by the presence of law enforcement officers during communications with his attorneys.

The Court finds that jurists of reason would not debate this Court's decision as to Adams's twelfth claim for relief  (ineffective assistance of counsel for failure to investigate his epileptic condition and his inability to waive his *Miranda* rights).  There was no indication at any time that he had a seizure while being interrogated or that he had epilepsy or any other medical condition.

The Court finds that jurists of reason would not debate this Court's decision as to the part of Adams's fifteenth claim found to have been defaulted (failure to object to the court's failure to conduct a hearing on a prospective juror's improper comment). The Court found that the underlying claim, misconduct by a prospective juror, had no merit.

-61-

In his eighteenth claim for relief, Adams alleged that his counsel were ineffective for failing to object and request merger of duplicative aggravating circumstances. The underlying claim was found to be without merit. Thus, the claim for ineffective assistance of counsel must also fail.

As to Adams's' preserved claims, the court finds that jurists of reason would not debate this court's decision as to his first claim for relief (ineffective assistance of counsel for failing to challenge Adams's competence to stand trial).  Three experts examined Adams and none of them diagnosed any psychosis or mental limitations. There was nothing before the Court showing that another opinion would result in a different evaluation.

In his third claim for relief, Adams alleged that the trial court had no justification for having a stun belt placed on him during trial.  The trial court held a hearing before ordering placement of the stun belt and found sufficient reason for its placement. Further, evidence of guilt was overwhelming. The Court finds that jurists of reason would not debate this Court's decision as to this claim for relief.

The fourth claim for relief concerned Adams's allegation that lethal injection used to implement the death penalty is unconstitutional.  The Court finds that jurists of reason would not debate this court's decision as to this claim for relief because at this time no federal court has held that Ohio's method of lethal injection is unconstitutional.

The Court finds that jurists of reason would not debate this Court's decision as Adams's fifth claim for relief (court's penalty phase jury instruction that its verdict was merely a recommendation).  The Sixth Circuit has determined that such instruction is constitutional.

The part of the ninth claim for relief not defaulted pertained to the State court's failure to

grant an evidentiary hearing in post-conviction relief proceedings when he had sufficient evidence and as to his allegations of violation of *Miranda* and *Edward*s. The claim was found to be without merit because a state has no obligation to provide post-conviction review and Ohio law does not provide for an automatic evidentiary hearing on the claims raised in post-conviction proceedings. The Court finds that jurists of reason would not debate this Court's decision as to Adams's ninth ground for relief.

The Court finds that jurists of reason would not debate this court's decision as Adams's tenth and thirteenth claims for relief ( ineffective assistance of counsel for failing to file a motion to suppress non-custodial and custodial statements made to police). The record showed that Adams was informed of his *Miranda* rights and he indicated that he understood them. Further, counsels' decision not to file a motion to suppress can be considered sound trial strategy.

In his fourteenth claim for relief, Adams asserted that the trial court improperly failed to conduct a *Daubert* hearing concerning the State's DNA evidence. The Court finds that jurists of reason would not debate this Court's decision as to Adams's fourteenth claim for relief because the Sixth Circuit has held that *Daubert* does not apply to the states.

The Court finds that jurists of reason would not debate this Court's decision as to the part of Adams's fifteenth claim found to have been preserved for federal habeas review (failure to object to the court's failure to conduct adequate inquiry as to a prospective juror's improper comment). The Court found that the facts demonstrated that Adams had not shown that he was prejudiced by the incident.

In his sixteenth claim for relief, Adams asserted that he did not receive a fair trial due to pretrial publicity. The Court found that voir dire showed that those who had been subjected to

media exposure knew very few details. Individual jury voir dire was extensive in this case and resulted in the seating of jurors who assured the court and the parties that they could impartially judge the case based on the evidence at trial and the judge's instructions. Therefore, the Court finds that jurists of reason would not debate this Court's decision as Adams's sixteenth claim for relief.

In his seventeenth claim for relief, Adams argued that his right to a fair and impartial trial was violated by his trial counsels' failure to conduct a meaningful and probing inquiry of prospective jurors during voir dire concerning their knowledge of his prior unrelated conviction for murder and the legally permissible attitudes concerning the death penalty. The Court examined the State court's review of the facts and its conclusion finding it not to be contrary to, or an unreasonable application of federal law as established by the United States Supreme Court. The Court finds that jurists of reason would not debate this Court's decision as to Adams's seventeenth claim for relief.

The Court finds that jurists of reason would not debate this Court's decision as Adams's nineteenth claim for relief (ineffective assistance of counsel for failing to offer specific mitigating factors for the jury to weigh against the aggravating circumstances). The trial court correctly instructed the jury as to the aggravating circumstances and mitigating factors. The court did not have to give a particularized jury instruction.

The Court finds that jurists of reason would not debate this Court's decision as Adams's twentieth claim for relief (ineffective assistance of counsel for failing to raise constitutional objections to Ohio's death penalty statutes).  The United States Supreme Court has held the death penalty to be constitutional and that Ohio law satisfies constitutional concerns.

-64-

For the reasons stated in this Opinion, this Court finds that none of the claims asserted in Adams's Petition for a Writ of Habeas Corpus under 28 U.S.C. §2254 are well-taken. Accordingly, Adams's request for habeas corpus relief is denied. The Petition is hereby dismissed.

Further, The Court finds no claims to be debatable among jurists of reason as no ground for relief comes close to presenting a federal constitutional or legal violation. Consequently, the Court denies a COA as to all claims for relief.

IT IS SO ORDERED.

_s/ David A. Katz_____
DAVID A. KATZ
U. S. DISTRICT JUDGE

-65-